IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

_____

ELIZABETH M. CATANIA,

               Plaintiff,

v.

UNITED STATES OF AMERICA,

               Defendants.

_____

**ATTORNEY AFFIDAVIT**

14-CV-553-A

STATE OF NEW YORK   )
                           )   SS:
COUNTY OF ERIE      )

       C. DANIEL MCGILLICUDDY, ESQ., being duly sworn, deposes and says:

       1.     I am an attorney duly licensed to practice law in the State of New York and I am an associate with William Mattar, P.C., attorneys for Plaintiff Elizabeth M. Catania ("Ms. Catania") in the above-referenced action. As such, I am fully familiar with the facts set forth below.

       2.     I submit this affidavit in support of the cross-motion of Ms. Catania, under Federal Rules of Civil Procedure 6(b)(1)(B) and 16(b)(4), for an extension of time to serve an expert disclosure for treating physicians pursuant to Fed. R. Civ. P. 26(a)(2)(A), whose medical records the Defendant United States of America ("the government") already possesses. I also submit this affidavit in opposition to the motion of the government for summary judgment based on the "serious injury" threshold. *See* New York Ins. Law §§ 5102(d); 5104.

## PROCEDURAL HISTORY

3.     This action arises from a May 7, 2013 side-swipe motor vehicle collision that occurred on Elmwood Avenue in the City of Buffalo, County of Erie, and State of New York. The associated police report is annexed to the Appendix[1] as **Exhibit A**.

4.     On or about October 14, 2013, Ms. Catania filed with the government an SF-95 Claim for Damage Injury, or Death alleging, *inter alia*, injuries to her neck and back as a result of the misfeasance of a member of an FBI task force, who was operating a government vehicle. The SF-95 Form is attached as **Exhibit B**.

5.     She thereafter commenced this action by filing a Summons and Complaint with the office of the Clerk of the United States District Court, Western District of New York, alleging personal injuries that qualify as a "serious injury" under Article 51 of the New York Insurance Law. The Summons and Complaint is attached as **Exhibit C**. Ms. Catania prayed for actual damages in the amount of $91,886.00. *Id.*

6.     After serving its Answer, the government served its First Set of Interrogatories, which included a demand for "The name and address of each person whom plaintiff intends to call as a witness at trial, and as to each such person, state the subject matter on which he or she has discoverable knowledge." It is annexed as **Exhibit D**.

7.     On or about March 24, 2015, Ms. Catania responded with a list of 16 witnesses, including the three treating doctors that are the subject of this cross-motion. Ms. Catania's

_____

[1] References to "Exhibit" and "Ex." refer to Plaintiff's Appendix Pursuant to Rule 56(a)(2) Statement of Material Facts ("Appendix"), which is incorporated by reference as though fully set forth herein.

response, together with a copy of her Rule 26 initial disclosure, is attached collectively as

**Exhibit E**.

      8.     Ms. Catania responded, in pertinent part, as follows:

> **RESPONSE**: . . . (10) Julius Horvath, D.C. at Horvath Chiropractic Center, 264 Ontario Street, Buffalo, New York 14203; (11) A. Marc Tetro, M.D. at Pinnacle Orthopedic & Spine Specialists, 700 Michigan Avenue, Buffalo, New York 14203; (12) Edward D. Simmons, M.D. at Simmons & Sherban Orthopaedic and Spine, 235 North Street, Buffalo, New York 14201 . . .

Ex. E.

      9.     This response fully comported with the averments in Ms. Catania's Rule

26(a)(1)(A)(ii) initial disclosure, which set forward that she would support her claim with copies

of medical records from:

- Horvath Chiropractic Center records of Elizabeth M. Catania, pertinent to injuries Ms. Catania sustained in the subject motor vehicle accident. Records are located at 264 Ontario Street, Buffalo, New York 14207.

- Pinnacle Orthopedic & Spine Specialists records of Elizabeth M. Catania, pertinent to injuries Ms. Catania sustained in the subject motor vehicle accident. Records are located at 700 Michigan Ave, Buffalo, New York 14203.

- Simmons & Sherban Orthopaedic and Spine records of Elizabeth M. Catania, pertinent to injuries Ms. Catania sustained in the subject motor vehicle accident. Records are located at 235 North Street, Buffalo, New York 14201.

*Id.*

      10.    Ms. Catania was deposed on January 7, 2016 at the office of the United States

Attorney, Western District of New York. A copy of the associated transcript is attached as

**Exhibit F**.

11.     Ms. Catania testified that before the May 7, 2013 motor vehicle collision, she did

not experience back pain. Ex. F, p. 11:8. She also did not recall having "any problems" with her

left wrist before the collision. *Id.*, p. 11:16-19.  She testified as follows:

> Q.     Okay. Now, prior to the accident had you had any problems with your
>        back?
> A.     Problems?
> Q.     Any physical pain or limitations, anything?
> A.     No.
> Q.     Had you ever made any complaints to any doctors about your back prior to
>        the accident?
> A.     Not that I recall.
> Q.     What about your neck, prior to the accident did you make any complaints
>        to any doctors about your neck?
> A.     Not that I recall.

*Id.*, p. 79:5-16.

> Q.     Had you had any prior history with headaches prior to May 2013?
> A.     No.
> Q.     Had you made any complaints of headaches to any medical provider prior
>        to May of 2013?
> A.     No.
> Q.     Had you made any complaints of headaches to any medical provider prior
>        to May of 2013.
> A.     Not that I remember.

*Id.*, p. 80:4-9.

> Q.     Prior to the accident did you have any problems involving your left
>        shoulder?
> A.     No.

*Id.*, p. 82:18-20

12.     At the time of the collision, Ms. Catania's vehicle was stopped. *Id.*, p. 47:7. The

impact caused her vehicle to move forward. *Id.*, pp. 47-48:24-3. It endured property damage that

cost "a couple thousand dollars." *Id.*, pp. 48-49:23-18. After the collision, Ms. Catania "wasn't

feeling so well so [she] called [her] doctor to see if [she could go] in." *Id.*, p. 59:3-7. Ms. Catania

was instead instructed "to go to the emergency room." *Id.,* p. 59:3-5. She went to Buffalo

General Hospital. *Id.,* p. 59:19-20. At Buffalo General, X-rays were taken. *Id.*, p. 83:17-18.

13.     Immediately after the collision, Ms. Catania experienced pain in her neck and

back. *Id.*, p. 78-79:24-4. She testified as follows:

> Q.     . . . Now, immediately after the accident did you experience pain
>        anywhere in your body?
> A.     Immediately after, so the same day?
> Q.     Yes, yes.
> A.     I had some spasm in my back. I had – my neck was in pain. My
>        wrist was in pain. I had some headaches, painful headaches.
> Q.     That same day?
> A.     Yes.
> Q.     Okay. So when did you first experience the spasm in your back?
> A.     The day of the accident I remember getting into my car and feeling
>        just very uncomfortable. The spasms in my back, which is why I
>        called to see if I could go see my doctor.

*Id.*, p. 78:3-21

> Q.     Okay. And what about the pain in your neck, when did you first
>        experience that?
> A.     The same day. It was something that I felt almost instantly but then
>        just got a little worse as time went on.

*Id.*, p. 78-79:22-4.

14.     Ms. Catania also "felt some pain in [her] wrist following the accident." *Id.*, p.

80:10-13. She tried taking pain medication, but was not comfortable taking it. *Id.*, p. 89:9-13.

15.     Ms. Catania described how at the time of the collision she worked for Buffalo

Public Schools, and her assignments could "change weekly, daily, monthly." *Id.*, p. 60:23-24.

When pressed for more information, she elaborated:

> Q.     Okay. Can you describe how your assignments worked?
> A.     They're per diem.
> . . .

A.   Typically if I get an assignment I am – I either can pick it up on an online site called Aesop. Once I get there it could turn into a month, a couple months, it could be a temporary position. That's generally how it works when you're a substitute teacher.

Q.   And for this employment as a substitute teacher, is that with the Buffalo Public Schools?

A.   Yes.

Q.   Is there such thing as a full time substitute teacher?

A.   Yes.

Q.   Is that the kind of assignment that you had?

A.   Yes. And to clarify, full time could be a full time, if they give you a month or a couple month assignment, if you're working every day. Basically you can work every day if you pick up something, different buildings every day. Or you can be at one building and be working according to however many days they need you for an assignment.

*Id.*, pp. 61-62:9-16.

16.   Ms. Catania clarified that, in May 2013, she "was working *full time as a substitute teacher* in one building . . ." *Id.*, p. 62:19-20 (emphasis added). The line of questioning continued:

Q.   And in May of 2013 were you working every day for the Buffalo Public Schools?

A.   In that year you asked?

Q.   Well, in May and let's say June. No, let's don't say June, let's say the two months before May?

A.   Yes.

Q.   Every day?

A.   Yes, I believe I was.

*Id.*, p. 65:3-10.

17.   Following the collision, Ms. Catania was not able to work:

Q.   Immediately following the accident were you able to work?

A.   I was in too much pain. It was very hard for me to stand. Still is this way but it was just very uncomfortable, very painful. My neck, my wrist, side of my leg, my hip area, just it was very uncomfortable. Just my body did not feel like my body anymore. Went from feeling one way to another way.

*Id.*, p. 88:1-9.

18.     Before the collision, Ms. Catania "was working out a lot." *Id.*, p. 81:4-14 (also did

yoga and pilates). Afterward, during the calendar year of 2013 at some point (*id.*, p. 82:7-8), she

"thought she could resume doing those things" but "could not" (*id.*, p. 81:4-7). She eventually

came to treat with Dr. Horvath, a chiropractor. *Id.*, p. 84:17-25. She had never treated with a

chiropractor before the collision. *Id.* She also started a course of physical therapy at Sport Focus.

*Id.* p. 86:9-14.

19.     At the time of her deposition testimony, over two-and-a half years after the

collision, Ms. Catania continued to suffer from pain complaints:

> Q.     Now, do you have pain that you associate with the collision from May
>        2013?
> A.     Some days are good days, some days are bad. I generally get – still get
>        numbing. I get bouts of sciatica, acute sciatica in my left side. My neck is
>        always uncomfortable and I experience frequent headaches, tension. Just
>        tension in my head, tension in my neck.

*Id.*, p. 13-20; *see also id.*, p. 88:13-15 ("I have pain, it's consistent, it's continuous").

20.     With respect to her wrist, it became "a little painful and some stiffness" when the

weather changes. *Id.*, pp. 97-98:25-2. At the time of her deposition testimony, she continued to

go to massage therapy two to three times per week. *Id.*, p. 94:22.

21.     On November 13, 2014 this Court entered a Scheduling Order, attached to the

Appendix as **Exhibit G**. Thereafter, on October 14, 2015, January 8, 2016, and April 12, 2016

this Court entered three Amended Scheduling Orders, annexed collectively as **Exhibit H**. The

Third Amended Scheduling Order provided that "Plaintiff(s) shall identify any expert witness

through interrogatories and provide reports pursuant to Fed. R. Civ. P. 26 by June 8, 2016."

Ex. H.

22.     While Ms. Catania had previously identified her expert witnesses through interrogatories well within the timeframe in the Third Amended Scheduling Order (Ex. E), she did not provide Rule 26 expert disclosure until January 27, 2017, beyond the timeframe in the Third Amended Scheduling Order. A copy of Ms. Catania's Rule 26(a)(2)(c) Expert Disclosure with certification of service is attached as **Exhibit I**.

23.     The reasons for the delayed service are set forth herein.

24.     Before the government brought this dispositive motion, the parties were seriously exploring mediation as a means for resolving this case. Mediator Michael Menard ("Mr. Menard") was certified on numerous occasions to serve as a mediator. Emails between counsel and Mr. Menard are attached collectively as **Exhibit J**.

25.     The mediation was scheduled for June 22, 2016.

26.     On October 3, 2016, your affiant spoke to opposing counsel and advised that Ms. Catania was available for a mediation session on November 14th, 17th, 28th, 29th and December 5th. During that telephone conversation, opposing counsel advised your affiant that it was acceptable for Ms. Catania to serve her Rule 26 Expert Disclosure along with updated medical records.

27.     The mediation was ultimately scheduled for October 11, 2016. On September 28, 2016 opposing counsel sent an email requesting an adjournment of the mediation, explaining the intention of the government to file a dispositive motion. Ex. J. At that time, it was the intention of the government to proceed with mediation while "the motion [was] on the table" insofar as settlement discussions would "be more meaningful." *Id.*

28.     The mediation was rescheduled for November 14, 2016. *Id.* Mr. Menard again filed a mediation certification. *Id.* It was, at that time, the intention of the government to file the dispositive motion by November 8, 2016. *Id.*

29.     On November 9, 2016 the government made clear its new intention "to cancel the mediation based on defendant's plan to file a dispositive motion." *Id.*

30.     Ms. Catania seriously intended to explore settlement at mediation. It was her whole-hearted intention to amicably resolve this case with the help and facilitation of Mr. Menard. This focus, unfortunately, distracted your affiant from the need to serve Rule 26 expert disclosure. To the extent that treating Drs. Horvath, Tetro, and Simmons were not witnesses "retained or specially employed to provide expert testimony" and Ms. Catania was under no obligation to provide reports pursuant Rule 26(a)(2)(B), your affiant admittedly overlooked the necessity to serve the less onerous pretrial disclosure required by Fed. R. Civ. P. 26(a)(2)(A) for expert witnesses who will testify pursuant to Fed. Rule of Evidence 702, 703, or 705.

31.     This was an oversight on the part of your affiant that was compounded by acclimation to state practice, where there is no disclosure requirement for treating doctors.

32.     By Notice of Motion dated December 22, 2016, the government brought the dispositive motion that is currently before this Court.

33.     On December 13, 2017, I called opposing counsel and explained that Ms. Catania had been involved in a December 12, 2016 slip-and-fall incident where she aggravated her already injured lower back. I asked whether, in view of the subsequent injury, the government intended to move forward with the motion, or whether it would prefer to conduct further deposition or physical examination. Opposing counsel said that before she made a decision, she

9

wanted to review associated medical records. The records were faxed to opposing counsel.

Copies of the records forwarded to opposing counsel on January 13, 2017 are annexed as

**Exhibit K**.

34.    On January 17, 2017 your affiant spoke with opposing counsel, who advised that,

despite the slip-and-fall incident, the government did not want to adjourn the motion or

otherwise hold it in abeyance pending further discovery.

35.    It was at this time that your affiant realized that, while treating Drs. Simmons,

Tetro and Horvath were disclosed as witnesses and their medical records were identified in Ms.

Catania's Rule 26 initial disclosure (Ex. F), Ms. Catania's formal expert disclosure had not been

served.

36.    On January 23, 2017 your affiant called and opposing counsel to discuss this

issue. During this conversation, I asked whether, pursuant to counselors' October 3, 2016

telephone conversation (*supra*, ¶ 26), the government would have any objection to a late Rule 26

expert disclosure. Opposing counsel stated that if the affidavits in opposition to the motion were

from treating physicians, and not from outside experts specifically retained for litigation, she

would have no objections.

37.    Based on this telephone conversation, on January 27, 2017, your affiant served

the Rule 26 expert disclosure. *See* Ex. I.

38.    On the same day, your affiant authored a letter to this Honorable Court explaining

that, in view of Ms. Catania's subsequent injury, "it may be appropriate to extend out the

discovery schedule to allow for . . . anticipated discovery to occur and then proceed to argument

of the motion, if necessary." It is attached as **Exhibit L**.

39.     By email dated February 1, 2017, Sandra D. Wilson of chambers asked opposing counsel whether she agreed to extension of the Scheduling Order dates as requested in the letter. Opposing counsel responded that she objected to any request to extend out the discovery schedule. The email is attached as **Exhibit M**.

## THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT

40.     In support of its motion, the government has submitted the report of medical examiner John Leddy, MD ("Dr. Leddy") dated February 5, 2016, with report addendum dated May 25, 2016. Def. Appx, Ex. O, P. The reports are purportedly based on a February 3, 2016 physical examination of Ms. Catania, together with a review of pertinent medical records and imaging studies. *See id.*

41.     At the outset, Dr. Leddy set forward Ms. Catania's then-"current symptoms" and limitations:

> [S]he continues to experience headaches, neck pain, shoulder pain, hip pain and back pain. She continues to experience intermittent numbness and tingling into her lower extremities, more so on the left, and sometimes she says that her hips lock up on her in her job as a teacher . . . In October of last year she says that he had an acute attack of sciatica and needed a cane to ambulate and was off work for 2 weeks . . . She says that he sued to exercise by doing martial arts, pilates and yoga prior to the accident but she is not doing these forms of exercise now. She walks up and down the stairs at school for exercise when she can . . .

Def. Appx., Ex. O, pp 1-3.

42.     Dr. Leddy then probed whether Ms. Catania endured any prior problems, noting that she "denie[d] any prior problems with her neck, back, hips or legs." *Id.*, p. 3.

43.     Dr. Leddy performed a physical examination of Ms. Catania's cervical spine, involving range-of-motion testing. *Id.* Notably, Dr. Leddy did not set forward the manner in which Ms. Catania's range of motion was measured. *See id.* Nevertheless, those measurements

yielded significant deficits upon extension (20/60 degrees), flexion (30/50 degrees), and bilateral rotation (45/80 degrees). *Id.* While Dr. Leddy stated that measurements in these planes were "subjectively reduced," he set forward no factual basis for the allegation. *Id; see also id.*, p. 4 ("She was advised to move only within the limits of her comfort . . ."). Dr. Leddy observed that Ms. Catania "complain[ed] of reduced light touch sensation in the entire right hand versus the left . . ." *Id,* p. 3.

44.     Dr. Leddy physically examined Ms. Catania's left wrist, showing that she was "mildly tender over the right CMC joint." *Id.*

45.     Turning to the lumbar/thoracic spine, Dr. Leddy measured decreased range of motion upon flexion (45/80 degrees). *Id.* She "[found] it difficult" to "toe walk and heel walk with adequate power" because of a "complaint of low back pain." *Id.* Importantly, straight leg raise testing on the right side "produce[d] a pulling sensation in her low back." *Id.* On the left it produced "a pulling sensation in her low back and left hip." *Id.* Reduced sensation to light touch was observed "over the right dorsal and medial aspects, *i.e.*, the L4 and L5 dermatomes . . ." *Id.*

46.     Dr. Leddy visualized a number of diagnostic imaging studies. *Id.*, p. 4. Critically, not one study predated the collision. *See id.*

47.     Dr. Leddy visualized structural changes to Ms. Catania's lumbar and cervical spine. *Id.* Interpreting a June 7, 2013 lumbar spine MRI, Dr. Leddy found: "degenerative disc disease with degenerative disc bulging to the left at L4-5 but no evidence of traumatic disc herniation, traumatic disc bulge, nerve root compression, or fracture . . ." *Id* (also interpreting October 11, 2014 study and finding "no significant change").

48.     Interpreting a cervical spine MRI taken the same day, Dr. Leddy found:

12

> [S]traightening of the cervical lordosis with advanced degenerative disc and bone disease at C6-C7 and lesser levels of diffuse degenerative disease from C2-C6. There is degenerative bulging at every level but most advanced at C5-C6 and C6-C7 with degenerative bone spurring at the C6-C7 level as well. There is degenerative spinal stenosis at C6-C7. There is no evidence of traumatic disc herniation, traumatic disc bulge, nerve root compression, or fracture at any level.

*Id.*[2]

49.     Nevertheless, as a result of the May 7, 2013 collision, Dr. Leddy causally related acute injuries to Ms. Catania's cervical and lumbar spine. *Id.*, p. 5 ("I conclude that Ms. Catania sustained cervical and lumbar muscle strains as a result of the 5/7/13 accident.").[3]

50.     While Dr. Leddy conceded that Ms. Catania had structural changes to her cervical spine in the form "straightening of the cervical lordosis," bulging at C5-C6 and C6-C7, and spinal stenosis at C6-C7 (*id.*, p. 4) and lumbar spine in the form of disc bulging to the left at L4-5, and he did not rely on a comparative imaging study predating the collision (*see id.*), he was somehow able to opine that Ms. Catania's "objective diagnostic studies show no evidence of trauma as a direct result of the 5/7/13 accident . . ." (*see id.*, p. 5).

51.     In support of its motion, the government further submitted a September 27, 2013 treatment note from orthopedist Dr. Tetro. Def. Appx., Ex. G. It reveals that Ms. Catania underwent a corticosteroid injection in her left hand/wrist. *Id.*, Bates 207. It also reveals that Ms.

---

[2] It is noteworthy that, in support of its motion, the government also submitted treatment notes from Ms. Catania's treating orthopaedist, Dr. Simmons, who interpreted the precise same studies to show (1) C6-7 retrolisthesis and a central disc herniation at C6-C7; and (2) L4-L5 left far lateral disc herniation resulting in moderate left foraminal narrowing. Def Appx., Ex. N, Bates 1625. According to Dr. Simmons "[Ms. Catania's] ongoing symptoms [were] causally related to the motor vehicle accident of 5/7/13." *Id.*

[3] As shown in Ms. Catania's Memorandum of Law, the New York Supreme Court, Appellate Division has held that a cervical/lumbar strain can be a "serious injury" under Insurance Law §§ 5102(d); 5104.

Catania endured a "soft tissue injury from direct trauma." *Id.*, Bates 208. The note continued:
Based on the mechanism of injury, it is our opinion that her current symptoms involving the left
hand and wrist would be entirely attributable to the 5/7/13 motor vehicle accident." *Id.,* p. Bates
209. The government also submitted an August 14, 2013 treatment note wherein Ms. Catania
was diagnosed with "dynamic scalpholunate ligament instability with associated occult dorsal
ganglion cyst." *Id.*, Bates 213.. A previous July 24, 2013 treatment note showed that Ms. Catania
tested "POSITIVE" under the Watson shift test." *Id.*, Bates 217. In fact, during that appointment
a "cock-up wrist splint" was deemed a "medical necessity." *Id.*, Bates 219.

    52.    The government also submitted copious "Progress Notes" documenting Ms.
Catania's treatment with chiropractor Dr. Horvath. Def. Appx., Ex. H, Bates 251. These records
included a June 18, 2013 Progress Report where, upon physical examination the following was
observed:

> **PHYSICAL EXAMINATION:** Lumbar ROM is diminished with local pain.  Lumbar paraspinal hypertonicity and moderate
> tenderness is noted during palpation.  Right Straight leg raising test are positive for local low back pain at greater than 45
> degrees.  Left SLR is positive for local low back pain at greater than 45 degrees.  Kemp's Standing and Seated tests are
> positive and increase this pain.  Valsalva's test is negative for radicular pain.  Deep tendon reflexes are bilaterally present
> and equal graded +1 for patellar and +2 for right Achilles but a +1 for the left Achilles reflex.  Muscle testing revealed no
> apparent weakness in any of the lower extremity muscles tested during the examination on the left or right leg muscles.  The
> lower extremity dermatomes revealed no abnormal dermatomal responses when tested on the left and the right upon
> examination. except for the right and left L5 and S1 regions which were hypoesthetic.

*Id.*, Bates 298.

    53.    The government also submitted a progress note from Buffalo Medical Group from
before the collision reflecting that Ms. Catania treated with a physical therapist on one occasion
on September 7, 2012 for right cervical pain, but discontinued treatment thereafter. Def. Appx.,
Ex. I, Bates 735. Defendant submits no pre-collision treatment records showing that Ms. Catania

treated for neck pain between September 7, 2012 and the date of incident. *See id.* Treatment

notes from Buffalo Medical Group dated May 9, 2013, after the collision, show immediate onset

of symptomatology:

> Elizabeth M Catania is a 37 year old female
> Pt was injured in MVA on 5/7/13, she was the Driver, wearing seat belt, stopped due to traffic, then she
> was rear ended by another car, she c/os immediate LBP, neck pain also Lt wrist swelling, she was eval in
> BGH ER right after the MVA, had neck x ray done, showed minor cervical spondylosis, no head injury, no
> LOC, she was Txed w DX flexeril 10 mg tid prn, tylenol #3 prn ( 20 pills),
> Motrin 600 mg tid,
> now c/os tingling and pain on Rt thigh also numbness, along with her LBP, now urine or bowel problems,
> no weakness in arms or legs,
>
> Has been taking motrin prn, tylenol # 3 prn,
>
> C/os pain is 4-5/10,
> Due to use of med. has been drowsy, she is a teacher, has not been able to work from 5/7/13

*Id.*, Bates 770.

54.     The government submitted a Buffalo General Hospital emergency room note

corroborating that Ms. Catania experienced symptoms on the date of incident:

**Basic Information**
  Time seen: Date & time 5/7/2013 09:53:00
  **History source:** Patient
  **Arrival mode:** Private vehicle
  **History limitation:** None
  **Additional Information:** Chief Complaint from Nursing Triage Note : Chief Complaint Description.
          5/7/2013  9:53                    Chief Complaint Description              Belted driver
          was in an MVA at slow rate of spped. Another vehicle struck her car from behind.
          C/o neck pain radiating down rt leg

**History of Present Illness**
  The patient presents following motor vehicle collision and rear ended slow rate of speed, belted driver, no LOC, was jarred forward in seat, now has
some diffuse neck pain, and some right sciatic pain into right thigh; walked away. The onset was 2 hours ago. The patient was the driver. There were
safety mechanisms including seat belt. Type of injury: deceleration. The degree of pain is minimal. The degree of bleeding is none. Risk factors consist
of none. The dominant hand is the right hand. Therapy today: none. Associated symptoms: none.

Def. Appx., Ex. K, Bates 530.

55.     The government further submitted an "Excuse Note" from Buffalo General

Medical Center, taking Ms. Catania out of work:

**Date:** 5/7/2013 11:35:27
**Patient Name: ELIZABETH CATANIA**

The above patient was seen at Buffalo General Hospital Emergency Department on the above date.

This patient will need to be excused with the following restrictions.

**Work**
_ xExcused from work

*Id.*

56.     The government also submitted the no-fault independent medical examination

report of Frank Luzi, M.D. ("Dr. Luzi") who performed an examination of Ms. Catania on behalf

of Erie Insurance Company. Def. Appx., Ex. M, Bates 1193. Dr. Luzi causally related lumbar

and cervical spine injuries to the subject collision. *Id.* The government also provided the no-fault

independent medical examination report of Louis Marconi, D.C. ("Dr. Marconi"). *Id.*, Bates

1199. While Dr. Marconi diagnosed Ms. Catania with cervical/lumbar sprain/strain, he opined

that "there is a causal relationship to the reported incident of 05/07/2013." *Id.*, Bates 1202.

57.     A copy of the government's Rule 26(a)(2)(B) Expert Disclosure is attached as

**Exhibit N**. The government did not disclose Drs. Luzi and Marconi as experts. Ms. Catania,

however, has been in possession of their reports throughout this litigation, and she is not

surprised by their conclusions, so she has no objection to their consideration by this Court.

## THE OPPOSITION PAPERS OF MS. CATANIA.

58.     In opposition to this motion, Ms. Catania has submitted the Affirmation of

Treating Orthopedist Dr. Simmons, annexed to the Appendix as **Exhibit O**.

59.     Dr. Simmons made clear that Ms. Catania appeared at his office on August 6,

2013 "with complaints of lower back pain, numbness/tingling, and neck pain, together with left

wrist and arm symptoms." Ex. O, ¶ 4. The symptoms started on the date of incident. *Id.* Her pain

16

"persisted," as did her limitations. *Id*. ("She described frequent headaches because of neck pain, causing difficulty reading, lifting, concentrating, and driving. She also reported loss of sleep of two-to-three hours due to pain. She experienced difficulty with prolonged standing, sitting and walking because of back pain.").

60.     Dr. Simmons described the physical exam he performed on that day, which "revealed tenderness with palpation over the lower cervical spine in the midline, the superior borders of the trapezius bilaterally, the interscapular region, low back in the midline, sacroiliac joints and hips." *Id*., ¶ 6. He measured significant deficits in the cervical spine, in multiple planes. *Id*. ("She exhibited deficits upon cervical flexion (30%), extension (30%), and bilateral rotation (30%)."). He found similar deficits in the lumbar spine. *Id*., ¶ 7 ("Using anatomical landmarks and employing objective methods, she exhibited deficits upon flexion (30%), and extension (20%)").

61.     Dr. Simmons reviewed a June 7, 2013 cervical spine MRI study, which revealed "*retrolisthesis at C6-C7*, a disc osteophyte complex and *central disc herniation at C6-C7*, uncovertebral hypertrophy and moderate *left foraminal narrowing*." *Id*., ¶ 8 (emphases added). He also reviewed a June 7, 2013 lumbar spine MRI study, which revealed "*L4-L5 left far lateral disc herniation resulting in moderate left foraminal narrowing* with a left facet cyst." *Id* (emphasis added). According to Dr. Simmons, "[t]his finding was consistent with the positive results of the straight leg raise test, constituting objective evidence of injury. *Id.* Dr. Simmons continued, specifically rebutting the claim of Dr. Leddy that there was "no evidence of trauma" (Def. Appx., Ex. O):

> Based on my firsthand observation of these films, it is my opinion to a reasonable degree of medical certainty that Ms. Catania endured acute structural changes to

17

her cervical and lumbar spine as a direct result of the May 7, 2013 motor vehicle collision. Retrolisthesis, a slipped disc, is a displacement of one vertebral body with respect to the adjacent vertebrae. It is mechanical damage that can be caused by physical trauma. A central disc protrusion is a type of herniated disc that also can result from trauma. A disc herniation can result from trauma. In sum, as a result of the May 7, 2013 collision, Ms. Catania endured structural changes to the architecture of her spine. I would accordingly disagree with any assessment that Ms. Catania only sustained cervical/lumbar strains as a result of the collision.

*Id.*, ¶ 9.

In sum, it is my opinion that Ms. Catania endured serious injuries to her cervical and lumbar spine as a result of the May 7, 2013 collision. I would disagree with any assessment that Ms. Catania merely endured cervical and lumbar muscle strains as a result of the collision. The post-collision diagnostic imaging studies do not show strictly degenerative disease; they instead show evidence of trauma. While there is some evidence of degeneration (which would be found in virtually anyone of Ms. Catania's age), any prior degeneration would have predisposed Ms. Catania to acute injury – which, as a result of the May 7, 2013 collision, she endured.

*Id.*, ¶ 19.

62.     "Based on the normal function, purpose and use of Ms. Catnia's neck, back, legs

and arms" (*id.*, ¶ 10),  Dr. Simmons conducted a qualitative assessment of Ms. Catania's cervical

spine injury:

. . . While she was able to look after herself normally, it caused extra pain. The pain prevented her from lifting heavy weights off the floor, but she was able to pick them up if they were conveniently positioned. She was not able to read as much as she was wanted to due to the pain in her neck. She had a moderate headache, which came frequently. She experienced difficulty concentrating and was not able to do her usual work. She experienced difficulty driving, and her sleep was disturbed (2-3 hours sleep loss). She was only able to engage in a few of her usual recreational activities due to the pain level. . . . As a result of her lumbar symptoms, she was prevented from lifting heavy weights off the floor. Pain prevented her from walking more than a half mile, or sitting/standing for more than one hour. Her sleep was disturbed.

*Id.*, ¶ 10.

. . . it is my opinion to a reasonable degree of medical certainty that these subjective symptoms correlate directly with the objective medical evidence. Specifically, the pain complaints and radicular symptomatology (and dermatomal distribution) endured by Ms. Catania are an expected medical consequences of the structural

changes to her cervical and lumbar spine. These limitations are not minor, mild or slight; but instead important and consequential.

*Id.*, ¶ 11.

63.     Dr. Simmons continued, explaining that Ms. Catania's months-long absence from work was medically indicated. *Id.*, ¶ 12 ("I am aware that Ms. Catania was a schoolteacher at that time. Her inability to perform ordinary duties, including standing sitting for prolonged periods of time, correlate directly with the objective medical evidence. For that reason, her inability to perform job duties as a schoolteacher during the months following the collision was medically indicated.").

64.     According to Dr. Simmons, Ms. Catania's symptoms and limitations persisted. *See generally id.*, ¶ 13. For instance, during a December 2, 2013 treatment session—almost seven months after the collision—she continued "to have ongoing problems with pain in her lower back radiating into the right lower extremity to the posterolateral thigh calf and foot." *Id.* She experienced "numbness and tingling in the right lower extremity" with symptoms that were "worsened by prolonged standing or sitting." *Id.* She also experienced persistent sleep difficulties. *Id.*

65.     Dr. Simmons performed another physical exam, which again yielded significant cervical and lumbar deficits of up to 40%. *Id.*, ¶ 14. He proposed a right transforaminal epidural injection at L4-L5 (*id.*, ¶ 15), which was administered "[u]sing a 6-inch 20-gauge spinal needle" (*id.*, ¶ 16).

66.     Dr. Simmons acknowledged that Ms. Catania was involved in a December 12, 2016 slip-and-fall incident injury "that exacerbated her existing lower back pain and lower

extremity difficulties." *Id.*, ¶ 18. "It [was the opinion of Dr. Simmons] that the May 7, 2013 collision predisposed Ms. Catania to injury during the November 21, 2016 incident." *Id.*

67.     Ms. Catania also submitted the Affidavit of Treating Chiropractor Dr. Horvath, annexed to the Appendix as **Exhibit P**.

68.     Dr. Horvath conducted a physical exam just one week after the collision on May 14, 2013, documenting significant range-of-motion deficits upon lumbar flexion (20/90 degrees), extension (0/30 degrees), right/left lateral bending (5/25 degrees), and right/left rotation (10/30 degrees). Ex. P, ¶ 6. Similar deficits were observed in the cervical spine. *Id.*, ¶ 7 ("Evaluation of the cervical spine region revealed that range of motion using an inclinometer noted that flexion was 30/50 degrees. Extension was 40/60 degrees. Right and left lateral bending was 25/45 degrees. Right rotation was 40/80 degrees. Left rotation was 50/80 degrees.").

69.     Significant deficits were observed during a July 14, 2014 treatment session – over one year after the collision. *Id.*, ¶ 12 (lumbar spine; "flexion was 60/90 degrees. Extension was 15/30 degrees. Right lateral bending was 15/25 degrees and left lateral bending was 20/25 degrees. Right and left rotation was 15/30 degrees."); *id.*, ¶ 13 (cervical spine; "flexion was 30/50 degrees. Extension was 40/60 degrees. Right lateral bending was 30/45 degrees and left lateral bending was 35/45 degrees. Right rotation was 60/80 degrees and left rotation was 70/80 degrees.").

70.     Dr. Horvath was crystal-clear that he took Ms. Catania out of work due to her injuries:

> Ms. Catania at the time of this accident was employed at the Buffalo Board of Education as a substitute teacher. As a result of the collision, she was considered totally disabled from the work force and from her usual and customary occupational duties from the time of the accident until September 1, 2013. I did furnish her a disability certificate disabling her from 05/07/2013 up until 09/01/2013 . . .

*Id.*, ¶ 8.

71.     Dr. Horvath interpreted post-collision MRI studies to show acute, traumatic injuries:

> Ms. Catania had MRI studies performed of the cervical spine on 06/07/2013. This showed evidence of a C5-C6 disc bulge that had subtle effect on the thecal sac. At C6-C7 there was a retrolisthesis with a disc spur complex which produced central canal stenosis. Ms. Catania had lumbar spine MRI performed on 06/07/2013. This showed evidence of a disc protrusion with far lateral extrusion that caused moderate narrowing of the left neural foramen and mild right foraminal narrowing. Thereafter, Ms. Catania had a follow up MRI of the lumbar spine which occurred on October 11, 2014. The radiologist did compare this study to her original study that was taken on June 7, 2013. This showed evidence of broad based disc herniation, again, extending into the foramen. There was compression on the left L4 nerve root in the foramen with moderate left foraminal narrowing and right-sided L4 nerve root was abutted. There was also abutment of the L5 nerve roots in the lateral recess noted. Ms. Catania had a third MRI of the lumbar spine which was taken on 12/17/2016. Again, this study was compared to its prior study from Buffalo MRI of 10/11/2014. Per the radiologist, "the findings were essentially similar to the prior study." There, again, was evidence of the L4-L5 disc herniation with bipyramidal extension.

*Id.*, ¶ 11*; see also id.*, ¶ 15 ("Ms. Catania is diagnosed with L4-L5 disc herniation with bipyramidal extension producing a lumbar radiculitis. She also has a lumbar facet syndrome, cervical spine disc bulge as well as retrolisthesis and a disc spur complex at the C6-C7 vertebral level. She also had cervicogenic cephalgia and cervical facet syndrome. These are all causally related to her accident that occurred on 05/07/2013 . . .").

72.     Ms. Catania also submitted the Affirmation of Treating Orthopedist Dr. Tetro, attached to the Appendix as **Exhibit Q**.

73.     Shortly after the incident, Dr. Tetro detected abnormality in Ms. Catania's left wrist and hand. Ex. Q, ¶ 4 ("mild digital fullness and swelling"; "definitive trauma and injury"; "swelling beyond the zone of the actual injury"; "maximum tenderness . . . at the scaphofunate interval, representing to me abnormality with that ligament"; "tendonitis of the finger-flexion tendon"). \     74.     He performed the Watson Shift Test to detect instability between the scaphoid and lunate bones of the wrist. *Id*., ¶ 5 ("This is objective evidence of abnormality that does not depend on subjective complaints of pain alone.").

75.     The conclusion of Dr. Tetro is unequivocal: "Ms. Catania endured an acute traumatic injury to her left wrist as a result of the May 7, 2013 collision." *Id*., ¶ 10; *see also* ¶ 11 (There is objective evidence of injury, as detected through a diagnostic imaging study (July 25, 2013 MRI) and positive Watson Shift Test.").

76.     Finally, Ms. Catania submitted her own affidavit, annexed to the Appendix as **Exhibit R**.

**ARGUMENT**

77.     The bases upon which this Court should grant the cross-motion of Ms.

Catania and deny the motion of the government are set forth in the enclosed Memorandum

of Law, to which this Court is respectfully referred. The Memorandum of Law is

incorporated by reference into this Affidavit, as though fully set forth herein.

C. DANIEL MCGILLICUDDY

Sworn to before me this
17th day of March 2017.

Notary Public

LISA M. McHUGH
Notary Public, State of New York
No. 01MC4999459
Qualified in Erie County
Commission Expires July 27, 2018