IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

_____

ELIZABETH M. CATANIA,

               Plaintiff,

v.

UNITED STATES OF AMERICA,         14-CV-553-A

               Defendants.

_____


## MEMORANDUM OF LAW IN SUPPORT OF THE CROSS-MOTION OF MS. CATANIA AND IN OPPOSITION TO THE MOTION OF THE GOVERNMENT.


WILLIAM MATTAR, P.C.
Matthew J. Kaiser, Esq.
*Attorneys for Plaintiff Elizabeth Catania*
6720 Main Street
Williamsville, New York 14221
(716) 633-3535

## FACTUAL AND PROCEDURAL BACKGROUND

The relevant factual and procedural background is set forward in the affidavit of C. Daniel McGillicuddy, Esq., sworn to on March 17, 2017, to which this Court is respectfully referred.

## ARGUMENT

### POINT I
### THIS COURT SHOULD GRANT THE CROSS-MOTION OF MS. CATANIA.

"When an act may or must be done within a specified time, the court may, for good cause, extend the time . . . on motion made after the time has expired if the party failed to act because of *excusable neglect*." Fed. R. Civ. P. 6(b)(1)(B) (emphasis added). "[E]xcusable neglect under Rule 6(b) is a somewhat 'elastic concept' and is not limited strictly to omissions caused by circumstances beyond the control of the movant." *Pioneer Inv. Servs. v. Brunswick, Assocs. Ltd. P'ship*, 507 US 380, 391-392 (1993). "Excusable neglect" applies to "instances of mere inadvertence, mistake or carelessness." *Id*. at 391-392.

In determining whether there exists "excusable neglect" relevant factors include:

[1] the danger of prejudice to the [non-movant], [2] the length of the delay and its potential impact on judicial proceedings, [3] the reason for the delay, including whether it was within the reasonable control of the movant, and [4] whether the movant acted in good faith.

*Luo v Baldwin Union Free Sch. Dist.*, 2017 U.S. App. LEXIS 1470, at *2 (2d Cir. Jan. 27, 2017, No. 16-421-cv) *quoting Pioneer*, 507 US at 395.

A review of each factor militates in favor of an extension. Extension poses no danger of prejudice to the government. Ms. Catania is not seeking to introduce experts who are specially employed to provide expert testimony. *See generally Geary v Fancy*, 2016 US Dist LEXIS 43786, at *1 (WDNY Mar. 31, 2016, No. 12-CV-796W(F)) (Foschio, J.). She is merely seeking to submit,

1

in admissible form, the opinions of treating providers who were duly identified (Def. Appx., Ex. D), and whose expert conclusions are undergirded by medical records the government already possesses and, indeed, submitted in support of this dispositive motion (*id.*, Ex. G, H, I, J, K, L, N). The length of the delay is minimal and, to the extent that the Rule 26 Expert Disclosure of Ms. Catania has already been served (*see* McGillicuddy Aff., Ex. E) any extension could be retroactive, having little impact on these proceedings.

Ms. Catania has also set forward good cause for the delay, militating in favor of an extension. "A finding of good cause depends on the diligence of the moving party." *Grochowski v. Phoenix Const.*, 318 F.3d 80, 86 (2d Cir. 2003). In this case, Mr. McGillicuddy—under the mistaken impression that this case would proceed to mediation and ultimately settle—overlooked the need to formally disclose the treating providers who were already identified in Ms. Catania's Rule 26 initial disclosure and interrogatories response. McGillicuddy Aff., ¶¶ 23-29. Mr. McGillicuddy acted in good faith at all stages, and, in fact, lodges no objection to the failure of the government to disclose as experts non-treating Drs. Luzi and Marconi (McGillicuddy Aff., ¶ 57), whose reports it submits in support of the motion (Def. Appx., Ex. M, Bates 1193-1203).

Based on the foregoing, this Court should grant the cross-motion of Ms. Catania.

## POINT II
## ALTERNATIVELY, THE LATE DISCLOSURE WAS HARMLESS, AND THIS COURT SHOULD CONSIDER THE AFFIDAVIT OF DR. HORVATH AND AFFIRMATIONS OF DRS. TETRO AND SIMMONS.

"If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, *unless* the failure was substantially justified *or is harmless*." Fed. R. Civ. P. 37 (c)(1) (emphases added); *see also Design Strategy, Inc. v. Davis*, 469 F.3d 284, 297 (2d Cir.

2006) (claim that "exclusion of evidence is automatic . . . cannot be squared with the plain language of Rule 37(c)(1) itself.").[1]

"Courts have held that imposition of Rule 37 sanctions is a drastic remedy that should only be applied in those rare cases where a party's conduct represents flagrant bad faith and callous disregard of the Federal Rules of Civil Procedure." *Hinton v. Patnaude*, 162 F.R.D. 435, 439 (N.D.N.Y. 1995) (citation omitted).[2] "[T]he imposition of sanctions under this rule is discretionary, and preclusion is ordered only rarely." *Brenton v Conrail*, 2006 US Dist LEXIS 46114, at *10 (WDNY July 7, 2006, No. 00-CV-0742E(Sr) (Elfvin, J.) (despite "counsel's misinterpretation of [the] scheduling order," considering affidavit of expert first identified when parties "filed their opposition papers to . . . motions for summary judgment").

Relevant considerations include "(1) the party's explanation for the failure to comply with the discovery order; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4)

---

[1] "The 1993 Advisory Committee Notes make clear that 'unduly harsh penalties' can and should be avoided: Limiting the automatic sanction to violations 'without substantial justification,' coupled with the exception for violations that are 'harmless,' is needed to avoid unduly harsh penalties in a variety of situations: *e.g., the inadvertent omission from a Rule 26(a)(1)(A) disclosure of the name of a potential witness known to all parties; . . . .*" *Fleet Capital Corp. v Yamaha Motor Corp., U.S.A.*, 2002 US Dist LEXIS 17502, at *4-5 (SDNY Sep. 19, 2002, 01 Civ. 1047 (AJP) (denying motion to strike testimony; "while [party] technically violated Rules 26(a) and 26(e) as to . . . its error was 'innocent' and harmless.") (emphasis added).

[2] *Accord In re Complaint of Kreta Shipping, S.A.*, 181 F.R.D. 273, 277-278 (S.D.N.Y. 1998) ("the strictures of Rule 26(a)(2)(B), combined with Rule 37(c)(1)'s harsh penalty for noncompliance, may at times tend to frustrate the Federal Rules' overarching objective of doing substantial justice to litigants") (internal quotation omitted); *In re Kreta Shipping, S.A.*, 181 F.R.D. 273, 277 (S.D.N.Y. 1998) ("excluding expert testimony can frustrate the Federal Rules' overarching objective of doing substantial justice to litigants.'"); *see also McNerney v. Archer Daniels Midland Co.*, 164 F.R.D. 584, 587 (W.D.N.Y. 1995).

3

the possibility of a continuance." *Softel, Inc. v. Dragon Med. & Scientific Comm., Inc.*, 118 F3d 955, 961 (2d Cir. 1997) (citation omitted).

In this case, the harsh remedy of exclusion should not apply. "The touchstone for determining whether to exclude an untimely expert report is whether the party opposing their admission is prejudiced." *Lore v City of Syracuse*, 2005 US Dist LEXIS 30328, at \*10 (NDNY Nov. 17, 2005, No. 5:00-CV-1833) *citing In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 791 (3d Cir.1994).

The Southern District has "declin[ed] to impose the harsh remedy of exclusion" where a party failed to timely disclose its expert where the opposing party "ha[d] known of [the party's] intention to call [the expert]" and "[would] not be prejudiced." *Pollack v Safway Steel Prods.*, 2007 US Dist LEXIS 24746, at \*15 (SDNY Mar. 30, 2007). This case is analogous:

- The government received the Rule 26 initial disclosure of Ms. Catania, wherein it was put on notice that, in support her claim, she would rely on medical records from her treating providers. Ex. E.

- The government then processed those records, sending them to its retained expert, Dr. Leddy, for review. Def. Appx., Ex. O, p. 3.[3]

- Ms. Catania served her response to the First Set of Interrogatories, making crystal-clear her intention to rely on the opinions of her treating providers. Ex. F.[4]

---

[3] "Record review: I reviewed the Answers to the Defendant's First Set of Interrogatories and medical records from Buffalo Medical Group, Buffalo General Hospital, Horvath Chiropractic, Buffalo Diagnostic Imaging, Pinnacle Orthopedics, Simmons & Sherban Orthopedic and Spine, Massage Therapeutic Arts and Buffalo MRI."

[4] When asked for "[t]he name and address of each person whom [she] intend[ed] to call at trial," Ms. Catania responded, *inter alia*, "Julius Horvath, D.C. . . . A. Marc Tetro, M.D. . . . [and] . . . Edward D. Simmons, M.D."

- During an October 3, 2016 telephone conversation with Mr. McGillicuddy—before the
  government filed this motion—opposing counsel was made aware that Ms. Catania
  intended to formally declare experts. McGillicuddy Aff., ¶ 26.

The government "[knew] of [Ms. Catania's] intention to call [Drs. Horvath, Tetro and
Simmons]." *See Pollack*, 2007 US Dist LEXIS 24747 at *15. To the extent that it submits medical
records from these providers in support of its motion (Def. Appx., Ex. G, H, I, J, K, L, N), the
government would "not be prejudiced," and the harsh remedy of preclusion should not apply.
*See Pollack,* 2007 US Dist. LEXIS 24746 at *15.

The Decision and Order of Judge Schroeder in *Britt v Buffalo Mun. Hous. Auth*., 2008 US
Dist LEXIS 22576 (WDNY Mar. 21, 2008, No. 06-CV-0057S (Sr)) is particularly instructive. The
defendants brought a motion to preclude expert testimony based on "[the] plaintiff's failure to
timely and adequately serve expert disclosure." *Id*. at *3. Counsel for the defendants claimed that
"she was unaware of the possibility that [the plaintiff's expert] would be utilized as an expert . . .
until she read [plaintiff's] counsels affirmation in opposition to her motion to preclude." *Id*. at *8.
Counsel for the plaintiff "proffer[ed] no legitimate excuse for his behavior." *Id.* Nevertheless,
Judge Schroeder declined to preclude the expert testimony, noting that "preclusion of [the]
plaintiff's experts would effectively extinguish plaintiff's claim, while the prejudice to defendants
of extending the deadlines in the Case Management Order would be minimal." *Id*. at *8-9.

This personal injury case revolves around the physical condition of Ms. Catania - before
and after the collision. Def. Appx, Ex. A, C. For this reason, preclusion of her treating doctors
"would effectively distinguish" her claim. *See id.* There is no prejudice to the government: It has
the factual data (medical records) upon which the opinions of her treating doctors are founded,

5

and, in fact, relies on that data in support of this motion. Def. Appx., Ex. G, H, I, J, K, L, N. Here, as in *Britt*, the harsh remedy of preclusion should not apply. *See id.*

The government was aware that Dr. Tetro causally related Ms. Catania's left wrist/hand injury to the collision. Def Appx., Ex. G, Bates 209 ("It is our opinion that her current symptoms involving the left hand and wrist would be entirely attributable to the 5/7/13 motor vehicle accident."). The government was equally aware that Drs. Simmons and Horvath causally related Ms. Catania's neck and back injuries to the collision. Def. Appx., Ex. N, Bates 1625 ("Elizabeth's ongoing symptoms are causally related to the motor vehicle accident of 5/7/13"); *see also* Def. Appx., Ex. H, Bates 298. Under these circumstances, preclusion would be drastic.

This case also bears some resemblance to the facts that confronted the Northern District in *Hinton v. Patnaube*, 162 F.R.D. 435, 439 (N.D.N.Y. 1995), where the defendant "object[ed] to [the] plaintiff's untimely submission of reports and affidavits of expert witnesses." As a result of pending settlement, however, the plaintiff's counsel had suspended further trial preparation involving experts. *Id.* The defendant then "responded to the settlement offer" by moving for summary judgment, implicitly rejecting settlement. *Id.* Finding that "[the] plaintiff's counsel was delayed by apparently good faith" and that "the untimely disclosure of the expert witnesses . . . was harmless," the Northern District denied the motion of the defendant for summary judgment, considering the affidavits of the expert witnesses that were not timely disclosed. *Id*. at 440.

Similar to *Hinton*, it was Mr. McGillicuddy's "whole-hearated intention to amicably resolve [this] case" through mediation. McGillicuddy Aff., ¶ 30. This "good faith" delay of Mr. McGillicuddy in formally disclosing Ms. Catania's treating providers "was harmless." *See id.* As such, assuming the cross-motion of Ms. Catania is denied, this Court should nevertheless consider

the affidavit of Dr. Horvath and affirmations of Drs. Simmons and Tetro on this motion, and permit all disclosed treating providers to testify at trial.

**POINT III**
**THIS COURT SHOULD DENY THE MOTION OF THE GOVERNMENT.**

Insurance Law § 5102(d) defines a "serious injury" as a:

> personal injury which results in (1) death; (2) dismemberment; (3) significant disfigurement; (4) a fracture; (5) loss of a fetus; (6) permanent loss of use of a body organ, member, function or system; (7) permanent consequential limitation of use of a body organ or member; (8) significant limitation of use of a body function or system; (9) or a medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which constitute such person's usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment (*i.e.*, the "90/180" category).

(internal parentheticals added).

The government argues that the injuries of Ms. Catania do not pierce the threshold of a "serious injury." It is the position of Ms. Catania, however, that a reasonable factfinder could find that she qualifies under the final three categories. This Memorandum will address these three categories vis-à-vis the injuries and limitations of Ms. Catania. The first subsection will address the issue of causation.

    i.    The injuries of Ms. Catania are causally related to the May 7, 2013 collision.

        a.    *There exists triable issues of fact on the face of the government's moving papers.*

A defendant must submit "persuasive evidence" that the plaintiff's pain and injuries are related to a preexisting or unrelated condition. *Pommells v. Perez*, 4 NY3d 566, 580 (2005) (seminal New York Court of Appeals decision). Evidence is "persuasive" when it "establish[es] as a matter of law that the injuries were *entirely attributable to . . . prior accidents and were not exacerbated by the accident in question*." *Benson v. Lillie*, 72 AD3d 1619 (4th Dep't 2010)

7

(emphasis added). Where the plaintiff was asymptomatic before the collision, it is incumbent on the defendant to explain the onset of pain following the collision.[5]

Take, for instance, the decision of the Fourth Department, Appellate Division last year in *Sobieraj v. Summers*, 137 AD3d 1738 (4th Dep't 2016), where the opinion of the defendant's expert that the condition "was the result of degenerative changes predating the accident" did not satisfy the initial burden of the defendant. The opinion, according to the court, "fail[ed] to account for evidence that [the] plaintiff had no complaints of pain prior to the accident." *Id*. at 1739.

Ms. Catania did not experience "problems" with her back before the collision. Ex. F, p. 79:8-9 ("Q. Any physical pain or limitations, anything? A. No."). Nor did she experience any "problems" with her left wrist before the collision. *Id*., p. 11:14-18. While Ms. Catania did treat briefly (one session) with a physical therapist before the collision for right cervical pain, there is no showing that she ever engaged in a course of treatment or otherwise was diagnosed with acute injury to her cervical spine. *See* Def. Appx, Ex. P, p. 2 (one treatment physical therapy session); Ex. O, ¶ 20 ("There is no indication . . . that Ms. Catania ever experienced neck or back pain between that time and the date of incident. Upon available information, she was asymptomatic.").

Dr. Leddy, the government's own expert, specifically acknowledged that, before the collision, Ms. Catania was asymptomatic. *See* Def. Appx., Ex. O, p. 2 ("She denies prior problems

---

[5] *See, e.g.*, *Endres v. Shelba D. Johnson Trucking, Inc.*, 60 AD3d 1481 (4th Dep't 2009) (IME report "failed to address the significance of the absence of any prior complaints of similar pain"); *Ashquabe v. McConnell*, 46 AD3d 1419 (4th Dep't 2007) (defendant failed to satisfy initial burden where plaintiff denied history of pain predating collision and IME report "failed to address the significance of the absence of any prior complaints of similar pain."); *Clark v. Aquino*, 113 AD3d 1076 (4th Dep't 2014) (defendant "failed to meet her initial burden by submitting persuasive evidence establishing that plaintiff's alleged injuries sustained in the accident were preexisting" where plaintiff was "free of ongoing neck pain" before collision); *Thomas v. Huh*, 115 AD3d 1225 (4th Dep't 2014) ("The opinion of [the defendant's expert] that plaintiff's condition was the result of degenerative changes predating the accident, fails to account for evidence that plaintiff had no complaints of pain prior to the accident").

with her neck, back, hips or legs."). He concedes that, in the immediate aftermath of the collision, Ms. Catania suddenly experienced neck, back, and left wrist pain.[6] Dr. Leddy conceded that post-collision diagnostic imaging studies detected structural changes to Ms. Catania's cervical and lumbar spine. *Id.*, p. 3 (lumbar spine study revealed "bulging to the left at L4-L5; cervical spine study showed "straightening of the cervical lordosis" and "spinal stenosis at C6-C7"). While Dr. Leddy chalks these changes up to degenerative disc disease that "t[akes] years to develop prior to 5/7/13" (*id.*, p. 4), he fails utterly to reconcile the immediate onset of symptoms on that particular date, as opposed to during those preceding years. This requires denial of the motion. *See*, e.g., *Benson*, 72 AD3d at 1619.

Dr. Leddy himself observed that, at the time of his examination of Ms. Catania, nearly three years after the collision, she exhibited persistent symptomatology. Def. Appx., Ex. O, p. 1 (" . . . she continues to experience headaches, neck pain, shoulder pain, hip pain and back pain. She continues to experience intermittent numbness and tingling into her lower extremities, more so on the left, and sometimes she says that her hips lock up on her as a teacher.").

In the face of structural changes to the architecture of Ms. Catania's cervical and lumbar spine that was first detected *after* the collision, Dr. Leddy's ultimate conclusion, several pages later, that she endured "cervical and lumbar muscle strains" that "are not serious injuries" is an implicit credibility determination. *Id.*, p. 5 ("by objective medical criteria, she has recovered . . ."). Issues of credibility can only be explored at trial.[7]

---

[6] Def. Appx., Ex. O, p. 3 ("she was seen in the emergency room complaining of neck pain and sciatic pain running down the leg); *id.*, p. 4 ("she had immediate low back pain, neck pain and left wrist swelling as a result of the accident . . .").

[7] The Court of Appeals has expressly held that a charge of malingering by a defense physician presents an issue of credibility "which is not for [the] Court to decide." *Perl v. Meher*, 18 NY3d 208, 219 (2011) ("The doctor said: 'The fact that he sits, yet presents with a show of

Assuming *arguendo* that Dr. Leddy's leaps of logic are not tantamount to an impermissible credibility determination, summary judgment remains inappropriate. Dr. Leddy causally related acute traumatic injuries—albeit "strains"—to the collision. Def. Appx., Ex. O, p. 5. A "strain" can be a serious injury. *See Sobieraj*, 137 AD3d at 1738 (issue of fact where "defendants' own expert concluded that plaintiff sustained a temporary muscle strain in the accident . . ."); *Cook v. Peterson*, 137 AD3d 1594 (4th Dep't 2016) ("we have held that a whiplash injury to [the] cervical spine and [a] lumbosacral sprain/strain can constitute a qualifying injury . . ."); *Bowen v. Dunn*, 306 AD2d 929 (4th Dep't 2003) ("the complaint as amplified by the bill of particulars" alleges a qualifying injury consisting of a whiplash injury to [plaintiff's] cervical spine and a lumbosacral sprain/strain.").

Under any analysis, the government has failed to set forward "persuasive evidence" that Ms. Catania's injuries were not caused by the subject collision.

        b.     *Alternatively, Ms. Catania has raised triable issues of fact on the issue of causation.*

Where the defendant does set forward "persuasive evidence" on the issue of causation, the burden shifts to the plaintiff to "come forward with evidence addressing [the] defendant's claimed lack of causation." *Pommells*, 4 NY3d at 580. This evidence must "adequately address how [the

---

only 10 degrees of flexion of the lumbar spine is contradictory. His 'give-away' strength is contradictory with his ambulation. This individual's show of such decreased range of motion is totally contradicted by the fact that he followed me about, rotating the cervical spine 60 degrees and flexing at least 30 degrees. I do not believe that this individual presents with any true findings at this time.' *The issue presented by this evidence, of course, is one of credibility, which is not for this Court to decide*.") (emphasis added); *accord* Thomas v. Huh, 115 AD3d 1225 (4th Dep't 2014) (denying summary judgment where defense physician "was alone in his opinion that plaintiff's limitations in his ranges of motion were magnified or self-imposed, and he provided no factual basis for that opinion"); *Bernardez v. Babou*, 83 AD3d 499 (1st Dep't 2011) ("Although the medical expert characterized plaintiff's response as subjective, there was no finding that her limitations were self-imposed or deliberate, and she apparently complied with all other tests.").

plaintiff's] current medical problems, in light of [her] past medical history, are causally related to the subject accident." *Briody v. Melecio*, 91 AD3d 1328, 1329 (4th Dep't 2012).

In this case, Ms. Catania has submitted the affirmations of treating orthopedists Drs. Simmons and Tetro. Ex. O, Q. She has also submitted the affidavit of treating chiropractor Dr. Horvath. Ex. P. Drs. Simmons, Tetro, and Horvath all causally relate the injuries of Ms. Catania to the subject collision. *See* Ex. O, P, Q.

A reasonable factfinder could easily conclude that, as a result of the collision, Ms. Catania endured an acute injury to her cervical spine:

- Dr. Simmons interpreted the same post-collision cervical spine MRI study as Dr. Leddy, finding "retrolisthesis at C6-C7," a "central disc herniation at C6-C7," and "left foraminal narrowing." Ex. O, ¶ 8. He specifically "disagree[d] with any assessment that Ms. Catania merely endured cervical . . . strains as a result of the collision," explaining that "[t]he post-collision diagnostic imaging studies do not show strictly degenerative disease; they instead show evidence of trauma." *Id.*, ¶ 19. In arriving at these conclusions, Dr. Simmons took into account Ms. Catania's prior, brief treatment for left-sided neck pain and stiffness. *Id.*, ¶ 20.

- Dr. Horvath, interpreting the same June 7, 2013 MRI study, likewise concluded that Ms. Catania endured "a C5-C6 disc bulge that had subtle effect on the thecal sac" together with "retrolisthesis" that produced "central canal stenosis" at the C6-C7 level. Ex. P, ¶ 11. He causally related "cervical spine bulge as well as retrolisthesis" to the collision. *Id.*, ¶ 15 ("They are all causally related to her accident that occurred on 05/07/2013 . . .").

A reasonable factfinder could likewise conclude that Ms. Catania endured an acute injury to her lumbar spine:

- Both Drs. Simmons and Horvath interpreted the post-collision lumbar spine MRI study—dated June 7, 2013, just one month after the collision—to reveal acute injury. *Compare* Ex. O, ¶¶ 8, 9 ("L4-L5 left far lateral disc herniation resulting in moderate left foraminal narrowing . . ."; "this finding was consistent with the results of the straight leg raise test, constituting objective evidence of injury"; " . . . Ms. Catania endured structural changes to the architecture of her spine.") *with* Ex. P, ¶¶ 11, 15 ("evidence of a disc protrusion with far lateral extrusion that caused moderate narrowing of the left neural foramen and mild right foraminal narrowing").

- Dr. Horvath acknowledged that Ms. Catania was involved in a November 20, 2016 slip-and-fall work incident, at which time she was still symptomatic. Ex. P, ¶ 14. A post-fall MRI study "that was performed after her fall" was "essentially unchanged." *Id.*

Finally, the question of whether Ms. Catania endured a traumatic injury to her left wrist must be submitted to a jury:

- Shortly after the incident, Dr. Tetro detected abnormality in Ms. Catania's left wrist and hand. Ex. Q, ¶ 4 ("mild digital fullness and swelling"; "definitive trauma and injury"; "swelling beyond the zone of the actual injury"; "maximum tenderness . . . at the scaphofunate interval, representing to me abnormality with that ligament"; "tendonitis of the finger-flexion tendon").

- He performed the Watson Shift Test to detect instability between the scaphoid and lunate bones of the wrist. *Id.*, ¶ 5 ("This is objective evidence of abnormality that does not depend on subjective complaints of pain alone.").

- The conclusion of Dr. Tetro is unequivocal: "Ms. Catania endured an acute traumatic injury to her left wrist as a result of the May 7, 2013 collision." *Id.*, ¶ 10; *see also* ¶ 11 ("There is

objective evidence of injury, as detected through a diagnostic imaging study (July 25, 2013 MRI) and positive Watson Shift Test.").

On a threshold motion, "[t]he differences of opinion among . . . medical experts with respect to the nature, cause and extent of [a] plaintiff's injuries raise issues of credibility that must be resolved by a jury." *Pagels v. P.V.S. Chems.*, 266 AD2d 819 (4th Dep't 1999) (emphasis added); *Linnane v. Szabo*, 111 AD2d 1304 (4th Dep't 2013) (issue of fact "based upon the conflicting reports and affidavits of the parties' medical experts."); *see also Chaston v. Doucoure*, 125 AD3d 500 (1st Dep't 2015) ("The dispute between the parties' experts as to whether the tears were related to the arthritis or to the trauma of the accident raises issues of fact."); *Torain v. Bah*, 78 AD3d 588 (1st Dep't 2010) ("The conflicting expert opinions as to the cause of plaintiff's cervical herniations raises an issue of fact for trial").

The opinions of treating providers Drs. Simmons, Tetro and Horvath stand in diametric opposition to the opinion of Dr. Leddy, who was retained by the government for this litigation. *Compare* Ex. O, P, Q *with* Def. Appx., Ex. O.

In this situation—"where a treating doctor attribut[es] the [plaintiff's] injuries to a different, yet altogether equally plausible, cause, that is, the accident"—the Court of Appeals has held that a jury must consider and resolve the conflicting expert proof. *See, e.g., Linton v. Nawaz*, 62 AD3d 434 (1st Dep't 2009) ("[treating doctor's] affirmation did reject [independent medical examiner's] opinion by attributing the injuries to a different, yet altogether equally plausible, cause, that is, the accident. . . .") *aff'd* 14 NY3d 821 (2010) ("the evidence plaintiff proffered relating to injuries . . . raised a triable question of fact as to whether he suffered a serious injury that was causally related to the accident."). Summary judgment is not warranted.

i.     *The injuries of Ms. Catania qualify under the significant limitation of use category.*

"[A] minor, mild or slight limitation should be classified as insignificant within the meaning of the statute." *Licari v. Elliott*, 57 NY2d 230, 236 (1982). "Whether a limitation of use or function is 'significant' . . . relates to medical significance and involves a comparative determination of the degree or qualitative nature of an injury based on the normal function, purpose and use of the body part." *Toure v. Avis Rent a Car Sys.*, 98 NY2d 345, 353 (2002) *quoting Dufel v. Green*, 84 NY2d 795, 798 (1995).

"A significant limitation need not be permanent in order to constitute a serious injury." *Telesco v Blackman*, 139 AD3d 709, 711-712 (2d Dep't 2016) (citation omitted). "Insurance Law § 5102(d) does not expressly set forth any temporal requirement, although assessment of the limitation's significance does require consideration of its duration in addition to its extent and degree." *Vasquez v. Almanzar*, 107 AD3d 538, 539 (1st Dep't 2013) (citation omitted).

"In order to prove the extent or degree of physical limitation, an expert's designation of a numeric percentage of a plaintiff's *loss of range of motion* can be used to substantiate a claim of serious injury." *Id*. at 350 (citations omitted). Alternatively, "[a]n expert's *qualitative assessment* of a plaintiff's condition also may suffice, provided that the evaluation has an objective basis and compares the plaintiff's limitations to the normal function, purpose and use of the affected body organ, member, function or system." *Id*. at 351 (emphasis added).

Under both quantitative and qualitative prongs, Ms. Catania has shown that her injuries are not "minor, mild or slight" as a matter of law. A factfinder should hear the case.

a.     *Ms. Catania has substantiated her claim of serious injury through a quantitative assessment.*

"It has been consistently held that a measure of [a range of motion] limitation, together with an MRI or other formal objective test, is sufficient to create a genuine issue of material fact."

14

*Pfeiffer v. Mavretic,* No. 04-cv-155, 2007 WL 2891433, at *8 (W.D.N.Y. Sept. 28, 2007). The Court of Appeals has declined to set forward parameters within which a range-of-motion deficit will raise an issue of fact. The Appellate Division, however, has held that deficits ranging from 16% to 50% will raise an issue of fact.[8]

Both parties must "recite the tests used to ascertain the degree of [the] plaintiff's range of motion." *Weaver v. Town of Penfield,* 68 AD3d 1782 (4th Dep't 2009). Thus, in order to establish entitlement to judgment as a matter of law under the significant/permanent consequential limitation of use categories, the defendant's expert must recite the objective test used to ascertain the plaintiff's range of motion. *See Linton v. Nawaz,* 62 AD3d 434 (1st Dep't 2009) ("The defendant cannot satisfy [its initial burden] if it presents the affirmation of a doctor which recites that the plaintiff has normal ranges of motion in the affected body parts but does not specify the objective tests performed to arrive at that conclusion.") *aff'd* 14 NY3d 821 (2010).

Dr. Leddy failed to set forward the manner in which he measured the range of motion in Ms. Catania's cervical and lumbar spine. Def. Appx., Ex. O, p. 3. This is fatal to the government's bid for summary judgment. *See Linton,* 14 NY3d at 821. Assuming that this Court were to excuse

---

[8] *See, e.g., Strong v. ADF Constr. Corp.,* 41 AD3d 1209 (4th Dep't 2007) (issue of fact upon showing of deficits ranging from 16% to 50%); *see also Hunter v. Siegel, Kelleher & Kahn,* 38 AD3d 1199 (4th Dep't 2007) (defendant failed to meet initial burden under significant limitation category by submitting report of expert noting that plaintiff's "cervical spine was limited in left rotation by 50% and flexion by 25%"); *Casinella v. Dill,* 5 AD3d 1047 (4th Dep't 2004) (range-of-motion deficits between 25% and 50% raised issues of fact); *Mangano v. Sherman,* 273 AD2d 836 (4th Dep't 2000) (issue of fact upon showing of, inter alia, 20% to 30% loss of flexion, rotation and extension in her neck, and a 20 degree loss of full elevation of the right shoulder); *Garner v. Tong,* 27 AD3d 401 (1st Dep't 2006) (20% and 25% deficits raised issue of fact*); Mazo v. Wolofsky,* 9 AD3d 452 (2d Dep't 2004) (20%); *Negrete v. Hernandez,* 2 AD3d 511 (2d Dep't 2003) (15%); *Livai v. Amoroso,* 239 AD2d 565 (2d Dep't 1997) (20%); *Schwartz v. NY City Hous. Auth.,* 229 AD2d 481 (2d Dep't 1996) (10%); *cf. Paolini v. Sienkiewicz,* 262 AD2d 1020 (4th Dep't 1999) (six percent range of motion loss insufficient).

this failure, summary judgment remains inappropriate: Based on a physical exam conducted nearly three years after the collision, Dr. Leddy detected significant deficits upon:

- Cervical extension (20/60 degrees, or 60%);
- Cervical flexion (30/50 degrees, or 40%);
- Bilateral cervical rotation (45/80 degrees, or 44%);
- Lumbar flexion (45/80 degrees, or 44%).

*Id.,* p. 3.[9]

Dr. Leddy alleges that measurements in these planes were "subjectively reduced," but sets forward no factual bases for the claim. *Id.*, p. 3. Indeed, to the extent that Ms. Catania was instructed by Dr. Leddy "to move only within the limits of her comfort," his charge of subjective limitation rings hollow. *Id.*, p. 4.

Where the "defendant [itself] submit[s] documents in support of [its] motion containing the requisite quantitative assessment," summary judgment must be denied. *See, e.g., Matte v. Hall,* 20 AD3d 898 (4th Dep't 2005); *accord Summers v. Spada,* 109 AD3d 1192 (4th Dep't 2013); *Tagliarino v. Staab,* 140 AD3d 1053 (2d Dep't 2016). Here, to the extent the government itself submits range-of-motion deficits, measured several years after the collision, that are not minor, mild or slight, summary judgment must be denied. *See* Def. Appx. Ex. O, P.

---

[9] In support of its motion, the government also submits the examination reports of Dr. Luzi, who examined Ms. Catania on behalf of her no-fault insurer for the purpose of determining whether benefits should be cut off. Def Appx., Ex. M. Based on a physical exam of Ms. Catania conducted on July 7, 2013, two months after the collision, Dr. Luzi concluded "[Ms. Catania's] neck is 50 percent of normal." *Id.*

Assuming this Court finds otherwise, Ms. Catania has raised issues of fact. With regard to the cervical and lumbar spine, Dr. Simmons measured "significant deficits in multiple planes."[10] Dr. Horvath measured similar findings.[11] With respect to the left wrist, Dr. Tetro, using a goniometer, measured deficits in multiple planes.[12]

This raises triable issues of fact. *See, e.g., Rosario v. Universal Truck & Trailer Service, Inc.*, 2 AD3d 362 (1st Dep't 2003) (cervical spine losses of 20-33 percent raised issues of fact).

        b.     *Alternatively, Ms. Catania has substantiated her claim of serious injury through a qualitative assessment.*

"[A] expert's qualitative assessment of a plaintiff's condition also may suffice" as long as it "has an objective basis and compares the plaintiff's limitation to the normal function, purpose and use of the affected body organ, member, function or system." *Toure*, 98 NY2d at 351; *accord Frizzell v. Giannetti*, 34 AD3d 1202 (4th Dep't 2006) (triable issue of fact where treating physician provided a qualitative assessment of his condition); *Vitez v. Shelton*, 6 AD3d 1180 (4th Dep't

---

[10] Ex. O, ¶ 6 ("She exhibited deficits upon cervical flexion (30%), extension (30%), and bilateral rotation (30%)."); *id.*, ¶, 7 ("Using anatomical landmarks and employing objective methods, she exhibited deficits upon flexion (30%), and extension (20%)."); *id.*, ¶ 14 ("She revealed significant deficits in lumbar spine range of motion upon flexion (40%), extension (30%), and right/left lateral bending (30%). Evaluation of the active range of motion in the cervical spine revealed significant deficits upon flexion (50%), extension (30%), and rotation (40%) to the left and right.").

[11] Ex. P, ¶ 6 ("range of motion upon flexion was 20/90 degrees. Extension was 0/30 degrees. Right and left lateral bending was 5/25 degrees. Right and left rotation was 10/30 degrees."); *id.*, ¶ 7 ("range of motion using an inclinometer noted that flexion was 30/50 degrees. Extension was 40/60 degrees. Right and left lateral bending was 25/45 degrees. Right rotation was 40/80 degrees. Left rotation was 50/80 degrees."); *id.*, ¶ 12 ("flexion was 60/90 degrees. Extension was 15/30 degrees. Right lateral bending was 15/25 degrees and left lateral bending was 20/25 degrees. Right and left rotation was 15/30 degrees."); *id.*, ¶ 13 ("flexion was 30/50 degrees. Extension was 40/60 degrees. Right lateral bending was 30/45 degrees and left lateral bending was 35/45 degrees. Right rotation was 60/80 degrees and left rotation was 70/80 degrees.").

[12] Ex. Q, ¶ 4 ("I measured range of motion deficits upon dorsiflexion (60 degrees out of 70 degrees), palmarflexion (60 degrees out of 70).").

2004) (plaintiff raised issue of fact by submitting objective proof of a bulging disc together with the qualitative assessment by her treating physician who concluded that her injury was significant, permanent and causally related to the accident); *La Forte v. Tiedemann*, 41 AD3d 1191 (4th Dep't 2007) (issue of fact where plaintiff submitted "the qualitative assessment of [her] treating surgeon"); *House v. Thornton*, 32 AD3d 1172 (4th Dep't 2006) (plaintiff raised issue of fact under categories by submitting the affidavit of her treating physician, who relied on objective evidence in providing a qualitative assessment of plaintiff's condition).

Dr. Simmons correlated the subjective complaints of Ms. Catania with the objective proof of acute injury to the cervical and lumbar spine:

> Ms. Catania completed an oswestry rating cervical spine functional report that gauged her functional capacity. Her pain was moderate. While she was able to look after herself normally, it caused extra pain. The pain prevented her from lifting heavy weights off the floor, but she was able to pick them up if they were conveniently positioned. She was not able to read as much as she was wanted to due to the pain in her neck. She had a moderate headache, which came frequently. She experienced difficulty concentrating and was not able to do her usual work. She experienced difficulty driving, and her sleep was disturbed (2-3 hours sleep loss). She was only able to engage in a few of her usual recreational activities due to the pain level. She also completed an oswestry rating cervical spine functional report that gauged her functional capacity. As a result of her lumbar symptoms, she was prevented from lifting heavy weights off the floor. Pain prevented her from walking more than a half mile, or sitting/standing for more than one hour. Her sleep was disturbed.
>
> Based on the normal function, purpose and use of Ms. Catania's neck, back, legs and arms, it is my opinion to a reasonable degree of medical certainty that these subjective symptoms correlate directly with the objective medical evidence. Specifically, the pain complaints and radicular symptomatology (and dermatomal distribution) endured by Ms. Catania are an expected medical consequences of the structural changes to her cervical and lumbar spine . . .

Ex. O, ¶ 10-11.

Dr. Horvath likewise set forward, qualitatively, the degree to which Ms. Catania's limitations (inability to work) jibed with the objective medical proof (structural changes to cervical and lumbar spine):

18

> She was unappreciative to pinprick. Motor evaluation noted all muscle groups had normal strength. Cervical spine compression test was positive for increasing neck pain. Distraction test was positive whereas simulation of traction gave relief. Jackson's test was positive for increasing ipsilateral neck pain consistent with joint or disc injury. Tenderness and subluxations were noted over C3, C4 and C5 vertebral levels. There was myospasm in the trapezius and levator scapular bilaterally.

> Ms. Catania at the time of this accident was employed at the Buffalo Board of Education as a substitute teacher. As a result of the collision, she was considered totally disabled from the work force and from her usual and customary occupational duties from the time of the accident until September 1, 2013. I did furnish her a disability certificate disabling her from 05/07/2013 up until 09/01/2013. Again, Ms. Catania missed work because of ongoing spinal pain and dysfunction from 10/02/2014 and was released back to the work force on 10/11/2014.

Ex. P, ¶ 7-8.

Dr. Tetro likewise related the "difficulties" of Ms. Catania "with fine motor tasks and activities requiring maximum dorsiflexion, such as pushing up from a chair or pushing an object." *Compare* Ex. Q, ¶ 12 ("All of these findings are consistent with an injury from a direct trauma") *with id.*, ¶ 13 ("These limitations are consistent with Ms. Catania's injuries, as documented by MRI, physical inspection, and Watson Shift Test.").

To the extent that Drs. Simmons, Horvath and Tetro have "sufficiently described the qualitative nature of [Ms. Catania's limitations] by opining that her pain limited her ability to do normal daily activities," summary judgment must be denied. *See Tandoi v. Clarke*, 75 AD3d 896, 897 (3d Dep't 2010); *see also Armstrong v. Morris,* 301 AD2d 931, 932-933 (3d Dep't 2003) (qualitative assessment where "doctor's report [made] a comparison between [the] plaintiff's condition and a normal functioning neck by opining that her pain [would] continue to impair her performance of ordinary daily activities which she [would] either avoid or accomplish only with pain.").

ii.     *The injuries of Ms. Catania qualify under the permanent consequential limitation of use category.*

The permanent consequential limitation of use category is similar to the significant limitation of use category, differing only with respect to former's permanency requirement. *See* Ins. Law § 5102(d). As observed by the Appellate Division:

A "permanent consequential limitation" requires a greater degree of proof than a "significant limitation", *as only the former requires proof of permanency*. Both sections require a showing that the limitation is "significant" or "consequential" in the sense that it is not minor or trivial.

*Altman v. Gassman*, 202 AD2d 265 (1st Dep't 1994) (emphasis added).

Drs. Simmons and Horvath have both opined that the acute, structural changes to Ms. Catania's neck and back will lead to permanent limitations. Ex. O, ¶¶ 21, 22 ("Ms. Catania's neck and back injuries are significant and permanent . . . She will experience limitations for the rest of her life."); Ex. P, ¶ 16 ("As a direct result of the injuries she sustained in her accident of 05/07/2013 permanent partial disabilities have occurred and she will be subjected to frequent and ongoing exacerbations of her symptom complex in the future . . . Ms. Catania endured a permanent consequential limitation of a body organ, member, function or system").

The well-founded opinions of Ms. Catania's medical providers raises triable issues of fact that must be submitted to a jury. *See, e.g., Barres v. Riker*, 85 AD3d 1628, 1630 (4th Dep't 2011) (issue of fact where "treating physician stated in an affidavit that the condition [of the plaintiff] was permanent and that the injury significantly limited her activity level."); *Garza v. Taravella*, 74 AD3d 1802, 1803 (4th Dep't 2010) (issue of fact based upon "the affidavit of [the plaintiff's] treating chiropractor and the affirmations of her treating physicians indicating that she sustained

neck and back injuries as a result of the accident and that those injuries . . . [*inter alia*] . . .

rendered her permanently disabled.").[13]

    iii.    *The injuries of Ms. Catania qualify under the 90/180 category.*

Serious injury qualification under the 90/180 category requires:

> a medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which constitute such person's usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment.

Ins. Law § § 5102(d); 5104.

The requirement of "[a] medically determined injury or impairment of a non-permanent nature" is satisfied by "sufficient objective medical evidence to establish a qualifying injury or impairment." *Toure*, 98 NY2d at 357. The Fourth Department, Appellate Division has described this requirement as follows:

> In our view, when a plaintiff presents objective evidence of a medically determined injury along with evidence that a medical provider placed restrictions on his or her daily activities, and there is no apparent explanation unrelated to the accident for those restrictions, it cannot be said as a matter of law that causation is lacking or that the plaintiff's limitations are based solely on subjective pain, particularly given that the nonmoving party must be afforded the benefit of every reasonable inference on a motion for summary judgment.

*Williams v. Jones*, 139 AD3d 1346, 1348 (4th Dep't 2016).

---

[13] Assuming *arguendo* that this Court were to find that the injuries and limitations of Ms. Catania do not qualify under the permanent consequential limitation of use category, but nevertheless qualify under a different category, Ms. Catania should be permitted to make a claim for future pain and suffering. *See Rubin v. SMS Taxi Corp.*, 71 AD3d 548, 550 (1st Dep't 2010) ("once an alleged claim meets at least one of the serious injury thresholds, the statute's gate keeping function, to reduce caseloads by limiting what the courts adjudicate, is satisfied. As the case is already in the gate, so to speak, judicial economy is no longer a reason to preclude plaintiff from presenting to the jury all injuries causally related to the accident."); *accord Obdulio v. Fabian*, 33 AD3d 418, 419 (1st Dep't 2006) (awarding future pain and suffering where jury found serious injury under only 90/180 category).

In this case, by taking Ms. Catania out of work for roughly 117 days during the 180 days immediately following the collision, Dr. Horvath "placed restrictions on [her] daily activities." *Compare* Ex. P, ¶ 8 ("I did furnish her a disability certificate disabling her from 05/07/2013 up until 09/01/2013.") *with Williams*, 139 AD3d at 1348 (issue of fact where "[o]ne of plaintiff's medical records from the period at issue state[d] that, based on [the] plaintiff's reports and his medical providers' clinical findings, [the] plaintiff was suffering from a temporary total disability and was to remain off work pending a further evaluation") (internal quotations omitted).

The opinion of Dr. Horvath that Ms. Catania was not able to work during the statutory period is corroborated by the opinion of Dr. Simmons that she "experienced difficulty concentrating and was not able to do her usual work." Ex. O, ¶ 10. It is further bolstered by the opinion of Dr. Tetro that Ms. Catania "experienced difficulties with fine motor tasks and activities requiring maximum dorsiflexion," required "a corticosteroid injection," use of a "cockup wrist splint" entailing "full immobilization of her left wrist and hand," and was "not able to perform her usual customary activities, such as working." Ex. Q, ¶¶ 6, 9, 13.

The plaintiff must also show that the injury prevented her "from performing substantially all of the material acts which constitute such person's usual and customary daily activities" during the relevant period. Ins. Law §§ 5102(d); 5104. The Court of Appeals has interpreted this statutory language to require a showing that the plaintiff "has been curtailed from performing his usual activities to a great extent rather than some slight curtailment." *Licari*, 57 NY2d at 236.

The government concedes that Ms. Catania did not work for at least 90 days during the 180 days immediately following the collision, returning to work as a substitute teacher in September

2013. Mitchell Decl., ¶ 9. New York intermediate appellate courts have held that such proof raises a jury question.[14]

At the time of the collision, while *per diem*, Ms. Catania "was working full time as a substitute teacher." Ex. F., p. 65:6-11. After the collision, Ms. Catania stopped working because she "was in too much pain." *Id.*, p. 88:1-9.

Dr. Horvath issued a disability certificate deeming Ms. Catania "temporarily totally incapacitated" from May 7, 2013 to September 1, 2013. Ex. P, sub-exhibit B ("Remarks: This disability status is a result of injuries sustained in a motor vehicle accident that occurred on 05/07/2013. A tentative date of return is scheduled for 09/02/013."). Dr. Tetro has affirmed that Ms. Catania "was not able to perform her usual customary activities, such as working." Ex. Q, ¶ 13 ("These limitations are consistent with Ms. Catania's injuries, as documented by MRI, physical inspection, and Watson Shift Test."). Dr. Simmons has likewise stated that Ms. Catania "was not able to do her usual work," finding that her subjective symptoms "correlate[d] directly with the objective medical evidence." Ex. O, ¶ ¶ 10, 11.

The argument of the government that Ms. Catania's "claim that she was not able to work cannot be substantiated" is misplaced. Mitchell Decl., ¶ ¶ 4-5. Ms. Catania has provided the No-Fault Wage Verification Report of her employer, the Buffalo Board of Education, which makes clear that she had been employed, on a *per diem* basis, as a substitute teacher since February 1, 2011. Exhibit R, sub-exhibit A. Due to her collision-related injuries, and pursuant to the express

---

[14] *See, e.g., Limardi v. McLeod*, 100 AD3d 1375 (4th Dep't 2012) (issue of fact where plaintiff was out of work for nine months); *Beutel v. Guild*, 28 AD3d 1192 (4th Dep't 2006) (four months); *Brannan v. Brownsell*, 23 AD3d 1106 (4th Dep't 2005) (four months); *Howell v. Holloway*, 17 AD3d 1117 (4th Dep't 2005) (four months); *Slisz v. Miga*, 15 AD3d 953 (4th Dep't 2005) (three months); *Sewell v. Kaplan*, 298 AD2d 840 (4th Dep't 2002) (93 days); *Nicholson v. Bader*, 105 AD3d 719 (2d Dep't 2013) ("more than 90 days"); *Diaz v. Dela Cruz*, 125 (1st Dep't 2015) (three months); *Pannell-Thomas v. Bath*, 99 AD3d 485 (1st Dep't 2012) (six months).

directive of her medical providers (Ex. P, sub-exhibit B), Ms. Catania received lost wages between May 7, 2013 and September 9, 2013. Exhibit R, sub-exhibit A.

Reliance by the government on *Dembele v. Cambisaca*, 59 AD3d 352 (1st Dep't 2009) for the proposition that Ms. Catania must proffer the affidavit of an employer is misplaced. That intermediate appellate decision predates the Court of Appeals' decision in *Ramkumar v. Grand Style Transp. Enters. Inc.*, 22 NY3d 905, 906 (2013) where, in a different but similar context, the Court rejected any "requirement that [a] plaintiff . . . offer documentary evidence to support his sworn statement." *Dembele* was last cited by an appellate court on June 18, 2013,[15] roughly four months before the Court of Appeals' October 15, 2013 decision in *Ramkumar*. The government cites no post-*Ramkumar* appellate authority that requires a 90/180-claiming plaintiff to submit the affidavit of an employer. *Dembele* is an outlier. *See, e.g., Diaz v. Dela Cruz*, 125 AD3d 552 (1st Dep't 2015) ("plaintiff raised an issue of fact by submitting his own affidavit averring that he was disabled from work for three months"). This Court should not follow it.

The government's reliance on *Arrowood v. Lowinger*, 294 AD2d 315 (1st Dep't 2002) is also misplaced. The *Arrowood* plaintiff signed an affidavit claiming that he was unable to "give golf lessons for three to five months" – a claim that was "contradicted by his deposition testimony." *Id*. at 316. The *Arrowood* plaintiff also lacked "a physician's affidavit substantiating his impairment and relating it to the accident." *Id.* This case represents a different scenario: Three treating providers have attributed Ms. Catania's work absence to the collision. Ex. P, ¶ 8; Ex. O, ¶ 10; Ex. Q, ¶ ¶ 6, 9, 13.

The government also points to *Thompson v. Abbasi*, 15 AD3d 95, 100 (1st Dep't 2005), where the plaintiff "only missed one week of work." Def. Memo, p. 21-22. The case at bar is

---

[15] *Clementson v. Price*, 107 AD3d 533 (1st Dep't 2013)

readily distinguishable. *See* Ex. R., ¶ 8; *see also* Ex. P, sub-exhibit B ("A tentative date of return is scheduled for 09/02/2013.").

Assuming *arguendo* this Court were to find that Ms. Catania's lengthy absence from work does not raise an issue of fact, summary judgment remains inappropriate. Before the May 7, 2013 collision Ms. Catania was "physically active." Ex. R, ¶ 4. After the collision, things changed:

> I was not physically able to carry laundry. Due to pain symptoms and limitation, I was not able to vacuum, mop and sweep the floor, and complete other household chores. I was not able to grocery shop on my own, requiring help from my son or his father, and I could not carry heavy bags and gallons of milk. I was not able to perform yardwork, such raking leaves, and gardening. I also struggled when attempting to paly with my son. I was no longer able to also work out. My symptoms were too severe.

*Id.*, ¶ 7.

Proof that a plaintiff has been unable to engage in her typical "household stuff" has been sufficient to raise a triable issues of fact.[16]

The question of whether Ms. Catania's usual and customary activities were curtailed to a "great extent" should be submitted to a factfinder. *See Licari*, 57 NY2d at 236.

---

[16] *See Hartley v. White*, 63 AD3d 1689 (4th Dep't 2009) (issue of fact under 90/180 category where defendant submitted evidence that plaintiff was unable to engage in her typical "household stuff," knit or regularly ride her bicycle in the six months after the accident); *accord Rienzo v. La Greco*, 11 AD3d 1038 (4th Dep't 2004) (defendant failed to meet initial burden where plaintiff testified that she was curtailed from performing her "household duties and recreational activities"); *Hedgecock v. Pedro*, 93 AD3d 1250 (4th Dep't 2012) (issue of fact under 90/180 category where plaintiff was prevented from "driving, attending class, or doing household chores"); *Houston v. Geerlings*, 83 AD3d 1448 (4th Dep't 2011) (defendant failed to meet initial burden on 90/180 claim where it was shown that plaintiff unable to perform daily grooming activities, to do simple chores or to play with children for three to four months following the accident).

## **CONCLUSION**

Based on the foregoing, this Court should grant the cross-motion of Ms. Catania and deny

the motion of the government, together with such other and further relief this Court deems just

and proper.


Dated: Williamsville, New York
       March 17, 2017

WILLIAM MATTAR, P.C.

By: _____

Matthew J. Kaiser, Esq.
*Attorneys for Plaintiff*
6720 Main Street
Williamsville, New York
(716) 633-3535