UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ELIZABETH M. CATANIA,

                                 Plaintiff,

                v.

UNITED STATES OF AMERICA,

                                 Defendant.
_____

REPORT
and
RECOMMENDATION
------------------------------
DECISION
and
ORDER

14-CV-00553A(F)

APPEARANCES:      WILLIAM MATTAR, P.C.
                  Attorneys for Plaintiff
                  C. DANIEL McGILLICUDDY,
                  F. DAVID RUSIN, and
                  MATTHEW JOSEPH KAISER, of Counsel
                  6720 Main Street
                  Suite 100
                  Williamsville, New York  14221

                  JAMES P. KENNEDY
                  ACTING UNITED STATES ATTORNEY
                  Attorney for Defendant
                  MARY K. ROACH
                  Assistant United States Attorney, of Counsel
                  Federal Centre
                  138 Delaware Avenue
                  Buffalo, New York 14202

## JURISDICTION

On September 30, 2014, Honorable Richard J. Arcara referred this case to the

undersigned for all pretrial matters including preparation of a report and

recommendation on dispositive motions.  The matter is presently before the court on

Defendant's motion for summary judgment (Dkt. 40), filed December 22, 2016, and on

Plaintiff's cross-motion for an extension of time to complete discovery (Dkt. 47), filed March 17, 2017.[1]

## <u>BACKGROUND</u>

On July 9, 2014, Plaintiff Elizabeth M. Catania ("Plaintiff"), commenced this action under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-80 ("FTCA" or "the Act"), seeking to recover for personal injuries allegedly sustained in a May 7, 2013, motor vehicle collision between a vehicle owned and operated by Plaintiff and a vehicle owned by Defendant United States of America ("Defendant" or "Government"), and operated by Keil Milbrand ("Milbrand"). Defendant's answer (Dkt. 7) was filed September 29, 2014.

In the court's initial Scheduling Order filed November 12, 2014 (Dkt. 12), the deadline for Plaintiff to disclose any expert witnesses and to provide expert witness reports was set as September 12, 2015. Plaintiff's expert witness disclosure deadline was extended three times, with the most recent deadline set forth in the Third Amended Scheduling Order (Dkt. 34) as June 8, 2016.

The parties have participated in several mediation sessions, with the last mediation session held on January 22, 2015, following which a Mediation Certification was filed November 9, 2016, indicating the case has not settled, but the parties may schedule another mediation session at a later date.

---

[1] Although Defendant's Motion for summary judgment is dispositive, whereas Plaintiff's Moion for an extension of time in which to complete discovery is non-dispositive, the court considers both motions in this combined Report and Recommendation/Decision and Order in the interests of convenience and judicial economy.

On December 22, 2016, Defendant filed the instant motion for summary judgment (Dkt. 40) ("Defendant's Motion"), the Declaration of Assistant United States Attorney ("AUSA") Gail Y. Mitchell (Dkt. 41) ("Mitchell Declaration"), Defendant's Statement of Material Facts Not in Dispute Pursuant to Local Rule 56.1 (Dkt. 42) ("Defendant's Statement of Facts"), exhibits A through Q (Dkts. 43-1 through 43-14) ("Defendant's Exh(s). __"), and the Memorandum of Law in Support of United States' Motion for Summary Judgment (Dkt. 44) ("Defendant's Memorandum").

On January 27, 2016, Plaintiff identified as expert witnesses, *inter alia*, treating physicians Edward D. Simmons, M.D. ("Dr. Simmons"), and A. Marc Tetro, M.D. ("Dr. Tetro"), and treating chiropractor Julius Horvath, D.C. ("Dr. Horvath"). Plaintiff, however, did not produce any expert witness reports for these three treating sources until January 27, 2017.

On March 17, 2017, Plaintiff filed a cross-motion seeking an extension of time to serve expert witness disclosure for her treating physicians and chiropractor (Dkt. 47) ("Plaintiff's Motion"), attaching the Attorney Affidavit of C. Daniel McGillicuddy (Dkt. 47-1) ("McGillicuddy Affidavit"), exhibits A through R (Dkts. 47-2 through 47-19) ("Plaintiff's Exh(s). __"), the Memorandum of Law in Support of the Cross-Motion of Ms. Catania and in Opposition to the Motion of the Government (Dkt. 47-20) ("Plaintiff's Memorandum"), and Plaintiff's Local Rule 56 Statement of Material Facts (Dkt. 47-21) ("Plaintiff's Statement of Facts"). On March 23, 2017, Plaintiff filed an amended version of Plaintiff's Exh. Q (Dkt. 48) ("Plaintiff's Exh. Q"). On May 15, 2017, Defendant filed Defendant's Memorandum of Law in Opposition to Plaintiff's Cross-Motion for Extension of Time to Serve Expert Disclosure (Dkt. 52) ("Defendant's Response"), the Affidavit of

AUSA Gail Y. Mitchell (Dkt. 53) ("Mitchell Response Affidavit"), and Defendant's Reply Memorandum of Law (Dkt. 54) ("Defendant's Reply").  On May 26, 2017, Plaintiff filed the Attorney Affidavit of Matthew K. Kaiser, Esq., in Reply (Dkt. 55) ("Kaiser Affidavit"), attaching the Reply Memorandum of Law in Further Support of the Cross-Motion of Ms. Catania (Dkt. 55-1) ("Plaintiff's Reply").  This court's June 19, 2017 Text Order (Dkt. 57), directed Defendant to file by July 7, 2017, a sur-reply to Plaintiff's Motion.  Accordingly, on June 29, 2017, Defendant filed the Affidavit of AUSA Mary K. Roach in Further Support of Defendant's Opposition to Plaintiff's Cross-Motion (Dkt. 58) ("Roach Affidavit"), and the Sur-Reply Memorandum of Law (Dkt. 59) ("Defendant's Sur-Reply"). Oral argument was deemed unnecessary.

Based on the following, Plaintiff's Motion is DENIED; Defendant's Motion should be GRANTED.


## FACTS[2]

**The Collision**

At 7:42 A.M. on Tuesday, May 7, 2013, a collision occurred in the southbound lane of Elmwood Avenue in Buffalo, New York ("the collision"), between two vehicles including a vehicle owned and operated by Plaintiff Elizabeth M. Catania ("Plaintiff" or "Catania") ("Plaintiff's vehicle"), and a vehicle owned by Defendant United States of America ("Defendant" or "Government") ("Defendant's vehicle"), and operated by Keil J. Milbrand ("Milbrand") who, although not a Government employee but a New York State Parole Officer, was then assigned to the Federal Bureau of Investigation ("FBI") Safe

---

[2] Taken from the pleadings and motion papers filed in this action.

Streets Task Force and on duty as a Task Force Officer. The New York State Department of Motor Vehicles Police Accident Report ("accident report")[3] issued by the Buffalo Police Department ("Buffalo Police"), pertaining to the collision indicates Plaintiff's vehicle turned into Defendant's vehicle while Milbrand was attempting to pass, resulting in a side-swipe collision. According to the accident report, there was damage to both vehicles, but no injuries, yet following the collision, Plaintiff presented to the emergency room at Buffalo General Medical Center ("Buffalo General"), complaining of neck pain radiating into her right leg, was diagnosed with a contusion and whiplash and given a one-day excuse from work. At the time of the collision, Plaintiff was employed on a per diem basis as a substitute teacher with the Buffalo Public School District.

**Medical History**

On August 16, 2012, Plaintiff was examined by her primary care physician Xinyue Liu-Chen, M.D. ("Dr. Liu-Chen"), in connection with complaints of severe left-sided neck and right upper back pain, particularly manifesting as severe sharp pain when turning her head. Defendant's Exh. L at Bates 713 (Dkt. 43-7 at 14). Plaintiff reported no known injury, but merely awoke with the severe pain. *Id.* Examination revealed decreased range of motion ("ROM"), in her cervical back with tenderness, bony tenderness and spasm, but no swelling. *Id.* at Bates 714 (Dkt. 43-7 at 15). Cervical spine X-rays taken August 17, 2012, were negative, and Plaintiff's acute neck pain was attributed to neck muscle spasm, for which conservative treatment was planned, including heating pad, massage, Motrin and Flexeril for three days, tapering to as needed. *Id.*

---

[3] Defendant's Exh. B (Dkt. 43-1 at 6); Plaintiff's Exh. A (Dkt. 47-2).

On September 5, 2012, Plaintiff continued to complain of "very bad pain from the top of her neck to her shoulder blades," for which Dr. Liu-Chen referred her for physical therapy. Defendant's Exh. L at Bates 728 (Dkt. 43-7 at 22). On September 7, 2012, Plaintiff underwent initial evaluation by Physical Therapist Laura Vargovich ("PT Vargovich"), for right cervical pain of insidious onset, described as burning and tingling down her right arm with frequent headaches, and turning her head increased the pain. *Id.* at Bates 729-35 (Dkt. 43-7 at 17-22; Dkt. 43-8 at 1). Plaintiff reported to PT Vargovich her neck pain had increased since its onset, and that prior to experiencing her neck pain, Plaintiff practiced martial arts four to five times a week. *Id.* Upon examination by PT Vargovich, Plaintiff's cervical active ROM showed flexion was mildly limited producing central posterior pain and pulling, extension was within normal limits producing pain at end range, and sidebending and rotation both showed mild limitation to the right producing right cervical pain, and mild limitation to the left with no change in pain. *Id.* Bilateral shoulder ROM was within normal limits throughout all planes, with pain reported in the right neck and scapular region with end range right shoulder flexion and abduction. *Id.* Manual muscle testing could not be assessed due to the severity of Plaintiff's symptoms. *Id.* PT Vargovich assessed Plaintiff's signs and symptoms were consistent with right cervical pain, diagnosed cervicalgia (neck pain), with good rehabilitation potential and physical therapy twice a week was scheduled with Plaintiff to be re-assessed after two weeks. *Id.* Plaintiff, however, did not return for any future physical therapy sessions, but was a "no-show" on September 10, 2012, and canceled for September 13, 2012, resulting in Plaintiff being discharged from physical therapy on October 31, 2012, for non-compliance. *Id.*

Plaintiff did not seek further treatment for her cervicalgia until after the May 7, 2013 collision. In particular, following the collision, Plaintiff drove herself to Buffalo General where Plaintiff complained of minimal diffuse neck pain and right sciatic pain radiating into her right thigh. Defendant's Exh. K (Dkt. 43-7 at 6-12). An X-ray of Plaintiff's cervical spine showed normal alignment, normal disc spaces, and no fractures, but slight loss of lordosis which may be positional or spasm, and minor spondylosis. *Id.*

On Thursday, May 9, 2013, Plaintiff was examined by Dr. Liu-Chen for complaints of low back and neck pain and left wrist swelling immediately after the collision, followed by tingling and pain in her right thigh with numbness, but no urine or bowel problems, nor any weakness in her arms or legs. Defendant's Exh. L at Bates 769-72 (Dkt. 43-8 at 2-5). Upon examination, ROM for Plaintiff's right and left wrists were within normal limits without tenderness, although Plaintiff had decreased ROM and was tender in the cervical and lumbar muscles with spasm. *Id.* X-rays of Plaintiff's lumbosacral spine were largely normal with no evidence of fracture, spondylolysis or spondylolisthesis, but mild degenerative disc changes at L5-S1. *Id.* Dr. Liu-Chen diagnosed low back pain with radiculopathy and neck pain, and continued Plaintiff's muscle relaxants and pain medications, advising Plaintiff to remain out of work until Monday because of pain and the drowsiness caused by Plaintiff's medications. *Id.*

On May 15, 2013, Plaintiff began chiropractic treatments with Julius Horvath, D.C. ("Dr. Horvath") of Horvath Chiropractic, for complaints of neck, thoracic and low back pain, left wrist and hand tingling, and leg numbness and tingling. Defendant's Exh. H at Bates 251 (Dkt. 43-4 at 18). On June 7, 2013, Plaintiff, upon Dr. Horvath's referral,

underwent magnetic resonance imaging ("MRI") of her cervical and lumbar spines. *Id.* at Bates 306-08 (Dkt. 43-4 at 4-6). The lumbar spine MRI showed moderate left L4-5 foraminal narrowing secondary to disc protrusion encroachment, possible far lateral disc extrusion, L4-5 facet prominence, mild central stenosis, and recess compromise mainly from anterior epidural encroachment by a disc bulge. The cervical spine MRI showed C6-7 spondylosis (degeneration), retrolisthesis (slipped disc) and mild central stenosis (narrowing of the spinal canal) from the pincer effect of encroachment by a disc spur ridge and the posterior elements, moderate left and mild right C6-7 forminal compromise from encroachment by spurring at the uncoverterbral joints (cervical spine directly below skull), and minimal bulge of the C5-6 disc. Neither the lumbar nor cervical MRI showed any evidence of traumatic disc herniation, traumatic disc bulge, nerve root compression, or fracture at any level. Defendant's Exh. O at 3 (Dkt. 43-11 at 4). Dr. Horvath examined Plaintiff on June 18, 2013, reporting Plaintiff had diminished lumbar ROM with local pain, lower limb pain, and dysesthesias (abnormal sensation), and diagnosed lumbar segmental dysfunction, disc bulge/herniation, and facet syndrome, suspected lumbar radiculopathy, pain in the extremities and parathesia (numbness or tingling), and a differential diagnosis of lumbar radiculopathy and peripheral neuropathy for which lower extremity nerve conduction velocity ("NCV") and electromyography ("EMG") diagnostic studies were ordered. Defendant's Exh. H at Bates 298 (Dkt. 43-5 at 3).

On July 17, 2013, Plaintiff underwent an independent physical examination by Frank Luzi, M.D. ("Dr. Luzi"), who diagnosed cervical and lumbar strain and sprain, and multiple level degenerative disc disease that pre-existed the May 7, 2013 collision,

considered largely a "factor of age," and for which Plaintiff was minimally symptomatic. Dr. Luzi's Report (Defendant's Exh. M at Bates 1193-95 (Dkt. 43-9 at 5-7)). Dr. Luzi opined Plaintiff could return to work with restrictions of avoiding repetitive bending of the neck or waist, lifting or carrying more than 20 lbs., and sitting, standing or walking for prolonged periods, but that Plaintiff's substitute teaching position would be within such restrictions. *Id.* Dr. Luzi further opined Plaintiff should attend physical therapy 2 to 3 times a week for 12 weeks, required no further diagnostic testing, and that a prescription for Flexeril would be reasonable for spasms, with over-the-counter Ibuprofen recommended for pain. *Id.*

On July 24, 2013, Plaintiff was examined by A. Marc Tetro, M.D. ("Dr. Tetro"), a head, shoulder and elbow surgeon, upon referral by Dr. Horvath for consultation. Defendant's Exh. G at Bates 216-20 (Dkt. 43-4 at 11-15). According to Dr. Tetro, Plaintiff reported that during the collision's impact, her left hand was on the steering wheel and since the collision Plaintiff had pain in her left wrist, and currently presented with pail in the dorsal aspect of the left wrist aggravated by dorsiflexion and pushing activities, and generalized stiffness involving the hand and forearm. *Id.* X-rays of Plaintiff's left wrist were largely unremarkable except for some lateral subluxation of the thumb metacarpal at the trapeziometacarpal CMC joint. *Id.* Dr. Tetro assessed left wrist sprain with possible scapholunate ligament tear, left hand diffuse flexor tensynovitis, left wrist extensor tensynovitis – primarily affecting the fourth compartment, and left wrist trapeziometacarpal CMC joint capsular laxity – currently asymptomatic. *Id.* Dr. Tetro opined Plaintiff's "significant" left wrist injury was causally related to the collision, rendered Plaintiff totally disabled, and treatment plan included MRI study of

the left wrist to evaluate the scapholunate ligament, full-time immobilization cockup wrist splint, and anti-inflammatory medication, with follow-up in four weeks. *Id.* On July 25, 2013, a left wrist MRI showed some swelling of the wrist dorsum possibly representing small ganglion cysts without evidence of traumatic tendinitis, traumatic ligament tear, or fracture. Defendant's Exh. O at 3 (Dkt. 43-11 at 4).

On August 6, 2013, Plaintiff was examined by Edward D. Simmons, M.D. ("Dr. Simmons"), an orthopedic surgeon, for complaints of "lower back pain-numbing/tingling; neck pain-wrist (left) and arm." Defendant's Exh. N at Bates 1623-25 (Dkt. 43-10 at 9-11). Upon examination, Plaintiff had decreased ROM in her lumbar spine with flexion at 30%, and extension at 20%, sensory exam was diminished to light touch of the left lower extremity globally compared to the right, and straight leg raising test was positive, producing low back pain. *Id.* at Bates 1625 (Dkt. 43-10 at 11). Dr. Simmons's impression was on-going neck pain, headaches and radiculopathy, low back pain, and left lower extremity radiculopathy, the symptoms of which were partially, temporarily improved with chiropractic treatment, and Plaintiff had recently begun massage therapy.[4] *Id.* The treatment plan included continuing the present regimen with re-evaluation in 3 to 4 months. *Id.* Dr. Simmons opined Plaintiff's on-going symptoms were causally related to the May 7, 2013 collision. *Id.*

In follow-up with Dr. Tetro on August 14, 2013, Plaintiff's demonstrated left wrist trapeziometacarpal CMC joint capsular laxity was then asymptomatic. Defendant's Exh. G at Bates 211-15 (Dkt. 43-4 at 6-10). Plaintiff reported improvement with the left wrist

---

[4] On August 30, 2013, December 6, 2013, and January 10, 2014, Plaintiff received massage therapy from Massage Therapeutic Arts, *see* Defendant's Exh. J at Bates 1674, 1675, 1695 (Dkt. 43-7 at 2-4), the records for which contain only codes with no explanation key such that the court cannot discern the significance of such treatments.

cockup wrist splint when used, but removal of the splint caused dorsal sided wrist pain to return. *Id.* Dr. Tetro noted Plaintiff's recent left wrist MRI showed no tear in the scapholunate interval region, and a corticosteroid injection administered by Dr. Tetro was well tolerated by Plaintiff. *Id.* Plaintiff was to continue use of the cockup wrist splint and Dr. Tetro opined Plaintiff remained disabled with regard to her usual occupation. *Id.*

Upon returning to Dr. Tetro on September 27, 2013, Plaintiff reported "near complete relief of her left wrist pain following a corticosteroid injection," and was without significant pain on a daily basis. Defendant's Exh. G at Bates 207-210 (Dkt. 43-4 at 2-5). Dr. Tetro assessed Plaintiff's left wrist trapeziometacarpal CMC joint capsular laxity as currently asymptomatic, observing Plaintiff had returned to work, with follow-up only as needed. *Id.*

On January 22, 2014, Plaintiff underwent an independent chiropractic examination by chiropractor Louis Marconi, D.C. ("Dr. Marconi"), who diagnosed resolved cervical and lumbar sprain and strain causally related to the May 7, 2013 collision, yet opined Plaintiff was not in any way disabled and could perform her normal and customary work as a substitute teacher, work in which Plaintiff was then engaged. Dr. Marconi's Report (Defendant's Exh. M at Bates 1199-1203 (Dkt. 43-9 at 8-12)). Dr. Marconi further opined there was no need at that time for further diagnostic testing or durable medical equipment. *Id.*

An October 11, 2014, lumbar spine MRI showed broad disc herniation at L4-L5 with left and right lateral radial annual tears, facet hypertrophy with left L4 nerve root impression, right L4 nerve root abutment, moderate left and mild right foraminal narrowing, mild lateral recess stenosis, L5 nerve root abutment, borderline central

spinal stenosis unchanged since the June 7, 2013 lumbar spine MRI, and stable hydration loss from T11-T12 through L4-L5. Defendant's Exh. H at Bates 252-53 (Dkt. 43-4 at 18-19).

On February 3, 2016, Plaintiff, in connection with the instant litigation, underwent an independent medical examination ("IME") conducted by Defendant's retained independent medical expert John Leddy, M.D. ("Dr. Leddy"), who also reviewed Plaintiff's medical records relative to the injuries for which Plaintiff sought medical treatment following the collision. Defendant's Exh. O (Dkt. 43-11 at 2-6) ("Dr. Leddy's Report"). In his report based on his physical examination of Plaintiff and review of Plaintiff's medical records and diagnostic studies, Dr. Leddy opined that as a result of the collision, Plaintiff sustained cervical and lumbar muscle strains, but there was no evidence of trauma directly caused by the collision. Dr. Leddy's Report at 5. According to Dr. Leddy, the evidence established degenerative disease not causally related to the collision and which took years to develop prior to the collision. Id. Dr. Leddy further determined that Plaintiff's physical examination revealed no evidence of cervical or lumbar muscle spasm, spinal or extremity muscle atrophy, nerve root impingement, radiculopathy, or neurological deficit, such that the objective medical evidence established Plaintiff had recovered from the cervical and lumbar muscle strains, which injuries are not serious, resolving with time and conservative treatment. Id. at 5-6.

In a May 25, 2016 addendum to Dr. Leddy's Report, Defendant's Exh. P (Dkt.43-14 at 2-4) ("Dr. Leddy's Addendum"), Dr. Leddy, based on a review of Plaintiff's deposition transcript and additional medical records and diagnostic studies, observed Plaintiff testified at her deposition that she then had good days and bad days with

regard to her complaints of numbing, sciatica, neck discomfort and frequent headaches, reported standing was possible but uncomfortable, Plaintiff was working and not taking any medications nor otherwise treating for her current symptoms other than massage therapy 2 to 3 times a week, and Plaintiff's wrist felt "okay" except for "a little pain when the weather changes." Dr. Leddy's Addendum at 2. Dr. Leddy noted that on July 17, 2013, Plaintiff underwent an independent medical examination by Dr. Luzi who diagnosed cervical and lumbar strain and sprain attributed to the collision, and multiple level degenerative disc disease pre-existing the collision, finding Plaintiff "was symptomatic to a very minimal degree." *Id.* at 3. Dr. Leddy also commended on Plaintiff's January 22, 2014, independent chiropractic examination by Dr. Marconi who diagnosed resolved cervical and lumbar sprain and strain from the collision, determining Plaintiff "was not disabled in any way and that she could do her normal and customary work duties as a substitute teacher." *Id.* After reviewing this additional evidence, Dr. Leddy's opinion was reinforced that Plaintiff sustained cervical and lumbar muscle strains but no trauma as a result of the collision, that the cervical degenerative disease was not causally related to the collision, and Plaintiff's spinal muscle strain had resolved with Plaintiff returning to her functional level prior to the collision, and her prognosis continued to be "good." *Id.*

On November 21, 2016, Plaintiff, who had returned to work as a substitute teacher with the Buffalo Public School District, slipped and fell at work. Plaintiff maintains the fall aggravated her previous injuries which Plaintiff claims were caused by the May 7, 2013 collision.

On January 27, 2017, Plaintiff belatedly provided Defendant with reports from treating sources whom Plaintiff seeks to have treated as her expert witnesses. These sources include orthopedists Drs. Simmons and Tetro, and chiropractor Dr. Horvath.

## DISCUSSION

**1.    Motion to Extend Time for Discovery**

Included in her papers opposing Defendant's Motion for summary judgment is Plaintiff's cross-motion to extend the discovery deadline to permit Plaintiff to serve expert witness disclosures for three treating sources including orthopedists Dr. Tetro and Dr. Simmons, and chiropractor Dr. Horvath ("the putative expert witnesses"). McGillicuddy Affidavit ¶¶ 8-9. Defendant argues in opposition that Plaintiff's belated request essentially seeks to reopen discovery more than seven months after it closed, that the request is beyond a procedural matter and cannot be attributed to excusable neglect, and that granting Plaintiff's request would result in significant prejudice to Defendant, including requiring Defendant to take additional discovery after filing its dispositive summary judgment motion. Defendant's Response at 2. In further support of the motion, Plaintiff maintains the requested retroactive extension of time to serve expert disclosures for the three putative expert witnesses will not result in any prejudice because Defendant is already aware of the identities of, and in possession of all relevant treatment records for, the putative expert witnesses such that Defendant cannot dispute already being apprised, prior to moving for summary judgment, of the subject matter, including the facts and opinions, on which the putative expert witnesses are expected to present evidence. Plaintiff's Reply at 1-2. Plaintiff further maintains

despite failing to timely serve expert disclosures, Second Circuit case law supports permitting the putative expert witnesses to testify as to opinions, formed during treatment, regarding causation, severity, disability, permanency, and future impairment, *id.* at 3-5, such that it was Defendant's prerogative to depose such treating sources and Defendant cannot characterize its own failure to do so as prejudice. *Id.* at 5-7. In further opposition, Defendant maintains the cases on which Plaintiff relies are inapposite and pre-date the current version of Fed. R. Civ. P. 26(a)(2)(C) ("Rule 26(a)(2)(C)"), such that Plaintiff's failure to provide the required Rule 26(a)(2)(C) disclosure requires treating the putative expert witnesses' testimony as fact witnesses, for which testimony is limited to issues of care and treatment, and no opinions as to causation and prognosis. Defendant's Sur-Reply at 2-6.

The Third Amended Scheduling Order filed April 11, 2016 (Dkt. 34) ("Third Amended Scheduling Order"), set June 8, 2016 as the deadline for Plaintiff to identify expert witnesses and provide reports, Third Amended Scheduling Order ¶ 3, November 8, 2016 for filing dispositive motions, *id.* ¶ 4, and December 6, 2016 as the mediation cut-off, specifically providing that "[t]he continuation of mediation sessions shall not delay or defer other dates set forth in this Scheduling Order." *Id.* ¶ 5. By e-mail dated September 28, 2016 ("September 28, 2016 e-mail"),[5] AUSA Mitchell advised McGillicuddy and the mediator, Michael Menard, Esq. ("Menard"), of Defendant's intention to file a dispositive motion, requesting postponing mediation scheduled for October 11, 2016, until after the dispositive motion was filed. According to a Mediation Certificate filed October 4, 2016 (Dkt. 36), further mediation was scheduled for

---

[5] Plaintiff's Exh. J (Dkt. 47-11 at 12 (repeated at, *inter alia*, Dkt. 47-11 at 17, 20, 23)).

November 14, 2016.  On October 28, 2016, Defendant moved to extend by 45 days the deadline for filing dispositive motions (Dkt. 37), which motion was granted by the undersigned with the Fourth Amended Scheduling Order (Dkt. 38), filed October 31, 2016, setting December 23, 2016 as the deadline for filing dispositive motions, but not extending the deadline for expert witness discovery.  In a Mediation Certificate filed November 9, 2016 (Dkt. 39), Menard indicated the case had not settled, but the parties may schedule another mediation session at a later date.  No further mediation has been scheduled.

According to Plaintiff, despite listing the three putative expert witnesses as witnesses Plaintiff intended to call at trial in her response to Defendant's First Set of Interrogatories,[6] dated March 24, 2015, well within the timeframe for doing so set by the Third Amended Scheduling Order, McGillicuddy Affidavit ¶¶  7, 22, Plaintiff neither timely identified the putative expert witnesses as such, nor provided reports from the treating doctors, attributing the failure to do so to anticipated mediation, a possible aggravation of Plaintiff's alleged low-back injury by an unrelated slip-and-fall incident on December 12, 2016, and lack of familiarity with federal practice.  *Id.* ¶¶ 23-35.  On January 23, 2017, after the instant motion had been filed, Plaintiff, realizing the oversight, inquired whether Defendant's counsel objected to expert witness disclosure after the June 28, 2016 expert discovery deadline, maintaining Defendant's counsel was not opposed so long as the information was from treating sources and not from outside experts specifically retained for litigation.  *Id.* ¶ 36.  Based on this purported conversation Plaintiff, on January 27, 2017, served on Defendant Rule 26 expert

---

[6] Plaintiff's Exh. E (Dkt. 47-6).

disclosures for the three putative expert witnesses, and requested by e-mail to the undersigned an extension of the expert disclosure deadline.[7]  *Id.* ¶¶ 37-38.  Upon receiving the belated expert discovery, AUSA Mitchell spoke with McGillicuddy on February 6, 2017, advising Defendant did not object to extending Plaintiff's time to respond in opposition to Defendant's pending summary judgment motion to March 17, 2017, but did object to any request to extending Plaintiff's time to provide expert disclosures which, per the Third Scheduling Order, was due by June 28, 2016, asserting its receipt on January 27, 2017 was both untimely and prejudicial.  *See* Plaintiff's Exh. J (Dkt. 47-11 at 5) (AUSA Mitchell's February 6, 2017 e-mail to chambers and McGillicuddy memorializing conversation with McGillicuddy).  Later on February 6, 2017, McGillicuddy stated in an email to chambers and Mitchell that if necessary, Plaintiff was prepared to move to extend the deadline for expert discovery, asserting that the action was scheduled for continued mediation in October 2016, when Mitchell agreed to accept expert declarations for all three expert treating sources provided Plaintiff forward all medical records, which Plaintiff had since done, and on which records Defendant relies in support of summary judgment, thus undermining any prejudice asserted by Defendant based on the late disclosure.  *Id.*

Pursuant to Rule 26(a)(2)(A), any witness expected to present evidence as an expert under Fed.R.Evid. Rules 702, 703, or 705, must be identified.  Absent stipulation or court order to the contrary, such disclosure "must be accompanied by a written report – prepare and signed by the witness – if the witness is one retained or specially

---

[7] Although Plaintiff's Notice of Rule 26(a)(2)(C) Expert Disclosure is incorrectly dated January 27, 2016, Plaintiff's Exh. I (Dkt. 47-10), at 10, the accompanying Certificate of Service, *id.* at 11, shows the correct date of January 27, 2017, which Plaintiff does not dispute.

employed to provide expert testimony in the case or one whose duties as the party's

employee regularly involve giving expert testimony. Fed.R.Civ.P. 26(a)(2)(B) ("Rule

26(a)(2)(B)").  The "written report" must contain six different types of information,

including

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
> (ii) the facts or data considered by the witness in forming them;
> (iii) any exhibits that will be used to summarize or support them;
> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
> (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
> (vi) a statement of the compensation to be paid for the study and testimony in the case.

Fed.R.Civ.P. 26(a)(2)(B).

Here, Plaintiff maintains that because none of the three treating medical sources

belatedly identified as expert witnesses was "retained or specifically employed to

provide expert testimony in the case," the disclosure of such witnesses' identities was

not required to be accompanied by the written report; rather, pursuant to Rule

26(a)(2)(C), the disclosure only need state

> (i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and
> (ii) *a summary of the facts and opinions to which the witness is expected to testify*.

Fed.R.Civ.P. 26(a)(2)(C) (italics added).

Rule 26(a)(2)(C) was added to the Federal Rules of Civil Procedure in 2010, with the

relevant Advisory Committee Notes specifying that "a witness who is not required to

provide a report under Rule 26(a)(2)(B) may both testify as a fact witness and also

provide expert testimony under Evidence Rules 702, 703, or 705.  Frequent examples

include physicians or other health care professionals and employees of a party who do not regularly provide expert testimony."  Fed.R.Civ.P. 26(a)(2)(C) advisory committee's note to 2010 amendment.

Prior to the addition of Rule 26(a)(2)(C), a treating physician, although not required to provide expert reports complying with Rule 26(a)(2)(B), was permitted to opine only as to "diagnosis, treatment, prognosis and causation, but *solely* as to the information . . . acquired through observation of the [p]laintiff . . . as a treating physician limited to the facts in the [p]laintiff's course of treatment," *Barack v. American Honda Motor Co., Inc.*, 293 F.R.D. 106, 109 (D.Conn. 2013) (quoting *Spencer v. Int'l Shoppes, Inc.*, 2011 WL 4383046, at *2 (E.D.N.Y. Sept. 20, 2011) (italics in original)), but was restricted from testifying on information acquired from outside sources.  *Franz v. New England Disposal Techs., Inc.*, 2011 WL 5443856, at *2 (W.D.N.Y. Nov. 9, 2011).  This restriction was based on the fact that prior identification of the treating physician, as required by Rule 26(a)(2)(A), along with the defendant's receipt of the plaintiff's medical records, would provide the defendant with sufficient notice of the basis and scope of the treating physician's anticipated expert testimony, such that treating physicians were not required to comply with the expert witness report requirements of Rule 26(a)(2)(B), yet the medical records would not necessarily contain information the treating physician may have acquired through outside sources, creating the possibility of unfair surprise and delay.  *Geary v. Fancy*, 2016 WL 1252768, at * 2 (W.D.N.Y. Mar. 31, 2016).  Furthermore, it is undisputed that treating physicians are to be considered as experts for purposes of Fed.R.Evid. 702, 703, and 705.  *Id.* 2016 WL 1252768, at * 3 (citations omitted).  "Thus, under Rule 26(a)(2)(C), a treating physician is an expert who may

testify regarding the treatment of plaintiff including the physician's diagnosis of plaintiff's injuries, causation and prognosis, *i.e.*, the permanency of a plaintiff's injuries or their effects, *provided the disclosure required by Rule 26(a)(2)(C) has been served on defendant*." *Id.* (italics added) (citing cases). Even if the required summary report is timely provided, a treating physician's testimony based on information acquired from outside sources is permitted "provided the basis for the testimony is within Rule 26(a)(2)(C)'s required summary report, and such disclosure complies with Rule 26(a)(2)(C)." *Id.*

Although Plaintiff couches her argument in support of extending the deadline for expert disclosure in terms of avoiding under Fed.R.Civ.P. 37 ("Rule 37), the sanction of having Plaintiff's expert evidence excluded for failing to comply with discovery, Plaintiff's Memorandum at 2-7, Plaintiff's request to extend the time for expert disclosures is properly analyzed pursuant to Fed.R.Civ.P. 6(b)(1)(B), which permits the court, for good cause, to extend a party's time to act after the relevant deadline has passed, only upon a showing of excusable neglect. *See LoSacco v. City of Middletown*, 71 F.3d 88, 93 (2d Cir. 1995) ("district courts may grant extensions of time in purely procedural matters like these upon a showing of 'excusable neglect.'"). "'[E]xcusable neglect' under Rule 6(b) is a somewhat 'elastic concept' and is not limited strictly to omissions caused by circumstances beyond the control of movant.'" *Id.* (quoting *Pioneer Inv. Services Co. v. Brunswick Associates Ltd. Partnership*, 507 U.S. 380, 391 (1993)). The requisite factors to be considered in determining whether to find excusable neglect to extend a scheduling order under Rule 6(b) include "[1] the danger of prejudice to the [non-movant], [2] the length of the delay and its potential impact on judicial proceedings, [3]

the reason for the delay, including whether it was within the reasonable control of the movant, and [4] whether the movant acted in good faith." *Pioneer Inv. Servs. Co.*, 507 U.S. at 388, 394-95. *See LoSacco*, 71 F.3d at 88 (the concept of excusable neglect "may encompass delays 'caused by inadvertence, mistake or carelessness, at least when the delay was not long, there is no bad faith, there is no prejudice to the opposing party, and movant's excuse has some merit.'"). The Second Circuit has focused on the third factor, *i.e.*, the reason for the delay. *Silivanch v. Celebrity Cruises, Inc.*, 333 F.3d 355, 366 (2d Cir. 2003) (citing *Canfield v. Van Atta Buick/GMC Truck, Inc.*, 127 F.3d 248, 250-51 (2d Cir. 1997) ("We have noted that the equities will rarely if ever favor a party who 'fail[s] to follow the clear dictates of a court rule' and held that where 'the rule is entirely clear, we continue to expect that a party claiming excusable neglect will, in the ordinary course, lose under the *Pioneer* test.'")). Further, "ignorance of the rules, or mistakes construing the rules do not usually constitute 'excusable' neglect. . . ." *Pioneer Inv. Servs. Co.*, 507 U.S. at 386. In the instant case, none of the factors favors extending the deadline to accommodate Plaintiff's belated expert disclosures.

Specifically, the first factor concerning prejudice to the non-movant weighs against permitting Plaintiff's belated expert disclosures given that Plaintiff did not disclose her expert evidence until January 27, 2017, seven months after the expert witness disclosure deadline and one month after Defendant moved for summary judgment, and then waited almost another two months before moving for an extension of time permitting the belated expert disclosure. As Defendant maintains, Defendant's Response at 5-6; Mitchell Response Affidavit ¶ 16; Roach Affidavit ¶ 15, Defendants' summary judgment motion was prepared based on a record that did not include

Plaintiff's proposed expert disclosures such that the considerable time and resources Defendant expended preparing the instant summary judgment motion was without benefit of the disclosures which include medical opinions as to the causation and permanency of Plaintiff's injuries, not found in the related treatment records previously disclosed in discovery.  As such, not only did Defendant not have the benefit of complete medical records and summary reports from the putative expert witnesses when preparing the summary judgment motion, but Plaintiff, in preparing her opposition to summary judgment, was able to "design" her expert disclosures to "fill in the gaps" and thereby defeat Defendant's Motion.  Defendant's Response at 12-13; Mitchell Response Affidavit ¶ 17; Roach Affidavit ¶ 16.  Defendant further maintains that should the court grant Plaintiff's motion, Defendant should be permitted to reopen discovery so as to depose the putative expert witnesses and to resubmit the summary judgment motion, requiring additional time and delay.  Mitchell Response Affidavit ¶ 18; Roach Affidavit ¶ 17.  Plaintiff maintains that because Defendant has been in receipt of all treatment records for the putative expert witnesses since prior to moving for summary judgment, Defendant essentially has all the information required by Rule 26(a)(2)(C), and Defendant could have chosen to depose the putative expert witnesses, such that allowing the late submission of the expert opinions will not result in any significant prejudice to Defendant.  Plaintiff's Reply at 2-3.  In further opposition to Plaintiff's Motion, Defendant argues not only do the medical records of Plaintiff's putative expert witnesses fall short of the required disclosure under Rule 26(a)(2)(C), but Plaintiff's failure to provide Rule 26(a)(2)(C)'s required summary report requires limiting any testimony from such medical providers to care and treatment as fact witnesses, and

does not permit such witnesses to testify as to causation and permanency.  Defendant's

Sur-Reply at 4-6.  Defendant further maintains the cases on which Plaintiff's relies in

support of her motion are inapposite.  *Id.*

In support of her motion, Plaintiff relies on *Geary v. Fancy*, 2016 WL 1252768

(W.D.N.Y. Mar. 31, 2016), *Maxwell v. Becker*, 2015 WL 4872137 (W.D.N.Y. Aug. 13,

2015), *Zanowic v. Ashcroft*, 2002 WL 373229 (S.D.N.Y. Mar. 8, 2002), and *Manganiello

v. Agostini*, 2008 WL 5159776 (S.D.N.Y. Dec. 9, 2008), none of which supports

Plaintiff's argument.  In particular, in *Geary*, this court observed that a treating physician

may, pursuant to Fed.R.Civ.P. 26(a)(2)(B), both testify as a fact witness and provide

expert testimony under Federal Rules of Evidence 702, 703, or 705, *Geary*, 2016 WL

1252768, at * 2, "provided the disclosure required by Rule 26(a)(2)(C) has been served

on the defendant."  *Geary*, 2016 WL 1252768, at 3.  Significantly, in *Geary*, the initial

report required by Fed.R.Civ.P. 26(a)(2)(C), detailing the treating physician's treatment,

prognosis, and opinion as to causation was timely provided, *id*. at * 1 (establishing

treating physician's expert disclosure, including identity, and statement describing

plaintiff's injuries, permanency of such injuries, and opinion as to causation, were timely

made), as was a supplemental report.  *Id*. at 4 (finding treating physician's supplemental

expert report, although filed four days after the expert witness disclosure cut-off, was

nevertheless acceptable because supplementation was required by Fed.R.Civ.P.

26(a)(2)(E)).  Because the basis for the treating physician's testimony was within the

summary report provided in accordance with Rule 26(a)(2)(C), the treating physician's

testimony was not to be limited to plaintiff's treatment.  *Id.*  In contrast, in the instant

case, Plaintiff merely identified, in response to Defendant's interrogatories, her treating

orthopedists and chiropractor, but did not provide any report indicating their opinions as to the likely permanency of Plaintiff's injuries, or causation. The significant factual distinctions between *Geary* and the instant case establishes that *Geary* provides no support for Plaintiff's position.

Similarly, in *Maxwell*, the plaintiff identified as experts eleven treating physicians, each of whom was expected to testify as to care and treatment provided, as well as causation, and provided from each a summary report in compliance with Rule 26(a)(2)(C). *Maxwell*, 2015 WL 4872137, at * 3. The plaintiff, however, was not permitted to have another physician testify as a retained expert based on the plaintiff's failure to provide for such physician a summary report complying with Rule 26(a)(2)(B)'s additional criteria. *Id*. at * 4. Accordingly, *Maxwell* also fails to support Plaintiff's position.

Furthermore, although in both *Zanowic* and *Manganiello*, the plaintiffs' respective treating physicians were permitted to testify at trial as to care, treatment, causation and prognosis, *Zanowic*, 2002 WL 373229, at *2-3; *Manganiello*, 2008 WL 5159776, at *12, both cases pre-date the 2010 amendment adding Rule 26(a)(2)(C) requiring disclosure of the subject matter, and a summary of the facts and opinions on which the putative expert witness is expected to present evidence and testify. Accordingly, neither *Zanowic* nor *Manganiello* provides any support for Plaintiff's argument.

Moreover, Defendant argues, Defendant's Response at 12-13, the proffered expert opinions are inconsistent with the relevant treatment records Plaintiff timely provided and on which Defendant's expert, Dr. Leddy, based his expert report, resulting in prejudice to Defendant based on the lack of opportunity to depose the putative

experts regarding the inconsistencies. Significantly, a treating medical doctor's testimony must be limited to that supported by the disclosed medical records. *See McEachron v. Glans*, 1999 WL 33597331, at * 4 (N.D.N.Y. Feb. 24, 1999) (precluding plaintiff's treating physician from testifying as to life expectancy and conscious pain and suffering where the medical records provided by the physician contained no references to observations of life expectancy and conscious pain and suffering). Specifically, Dr. Leddy references orthopedist Dr. Simmons's August 6, 2013 examination for which Dr. Simmons fails to include in the relevant treatment records any assertion as to the permanency of Plaintiff's injuries attributed to the May 7, 2013 collision. Dr. Leddy's Report at 5. Nor do any of Dr. Simmons's other medical treatment records, Defendant's Exh. O (Dkt. 47-16 at 22-97) ("Dr. Simmons's Medical Records"), showing Dr. Simmons treated Plaintiff on August 6, 2013, Dr. Simmons's Medical Records at 23-25, December 2, 2013 (*id.* at 47-49), and December 19, 2013 (*id.* at 58-59), indicate that Plaintiff's injuries are permanent. In contrast, in his summary report, Defendant's Exh. O (Dkt. 47-16) at 2-9 ("Dr. Simmons's Report"), Dr. Simmons opines Plaintiff's injuries are permanent. Dr. Simmons's Report ¶ 21. Not only was Defendant, when moving for summary judgment, without the benefit of Dr. Simmons's opinion that Plaintiff's injuries were permanent, but it is not clear the extent to which such opinion is premised on the injuries sustained during the May 7, 2013 collision, compared to the injuries Plaintiff sustained in a work-related injury on November 21, 2016, following which Plaintiff returned to Dr. Simmons on December 12, 2016 (*id.* at 50-53; corrected at *id.* at 60-63), and February 22, 2017 (*id.* at 54-57). Nor does Dr. Leddy comment on the transforaminal epidural injection Dr. Simmons administered at L4-L5 of Plaintiff's lumbar

spine at the December 19, 2013 visit, and which Dr. Simmons avers was medically necessary based on the injuries Plaintiff sustained as a result of the collision. Dr. Simmons's Report ¶¶ 15-17. Although Dr. Simmons continues that "[t]he injection may have improved her symptoms, but it could not heal the underlying cause," *id.* ¶ 17, Plaintiff did not return to Dr. Simmons until December 12, 2016, after the November 21, 2016 work accident which allegedly exacerbated Plaintiff's existing lower back injury and difficulties with her lower extremities. *Id.* ¶ 18. Insofar as Dr. Simmons opines Plaintiff's injuries caused by the May 7, 2013 collision predisposed Plaintiff to further injury when she slipped and fell on November 21, 2016, Dr. Leddy did not have access to this information. Nor in any of the treatment records is the method Dr. Simmons used to discern the asserted ROM of motion deficits identified, yet Dr. Simmons states that he used anatomical landmarks and "objective methods."[8] *Id.* ¶ 6.

Similarly, Dr. Leddy observed that orthopedist Dr. Tetro treated Plaintiff for left wrist pain Plaintiff had since the May 7, 2013 collision, for which Dr. Tetro prescribed a brace and an MRI, Dr. Leddy's Report at 4, the results of which showed some swelling of the dorsum of the left wrist possibly representative of small ganglion cysts, but no evidence of traumatic tendinitis, traumatic ligament tear, or fracture. *Id.* at 3. Dr. Leddy comments that Dr. Tetro's medical records that had been timely provided to Defendant indicate that on August 14, 2013, Plaintiff received from Dr. Tetro a corticosteroid injection in her left wrist, *id.* at 6-10, and on September 27, 2013, Plaintiff reported "near complete relief of her left wrist pain following a corticosteroid injection," *id.* at 2, was

---

[8] The court notes, as discussed below, Discussion, *infra*, at 45-47, objective medical testing, including use of a goniometer or inclinometer to measure ROM, as well as indicating whether the chosen methodology consisted of active or passive ROM tests, is required to establish a serious injury under New York's No-Fault Law.

asymptomatic, and had returned to work.  *Id.* at 2, 4.  Plaintiff did not seek further

treatment from Dr. Tetro.  Although in Dr. Tetro's medical records, Plaintiff's Exh. Q

(Dkt. 48 at 19-34) ("Dr. Tetro's Medical Records"), the manner by which Dr. Tetro

determined the deficits in Plaintiff's left wrist ROM is not revealed, Dr. Tetro explains in

his proffered expert opinion (Dkt. 48 at 2-7) ("Dr. Tetro's Report"), that he used a

goniometer obtain such deficits.  Dr. Tetro's Report ¶ 4.  Defendant, however, did not

have the opportunity to investigate this belated assertion that is not supported by Dr.

Tetro's medical records.

Finally, Plaintiff's treating chiropractor, Dr. Horvath, opines that Plaintiff "endured

a permanent consequential limitation of a body organ member function or system; and a

medically determined injury or impairment which prevented her from performing

substantially all of the material acts which constituted her usual and customary daily

activities for not less than 90 days during the 180 days following date of incident."

Affidavit of Treating Chiropractor, Plaintiff's Exh. P (Dkt. 47-17 at 2-8) ("Dr. Horvath's

Report")), ¶ 20.  Careful review of Dr. Horvath's treatment records, Plaintiff's Exh. P

(Dkt. 47-17 at 14-65) ("Dr. Horvath's Medical Records"), do not support this opinion;

rather, Dr. Horvath's Medical Records are devoid of any mention as to permanency of

Plaintiff's claimed injuries, and, in fact, are contrary to the assertion that Plaintiff was, for

90 out of the 180 days immediately following the May 7, 2013 collision, unable to

perform substantially all the material acts constituting Plaintiff's usual and customary

daily activities.  *See* Dr. Horvath's Medical Records at 19 (Roland Morris Disability Index

completed on May 14, 2013, for which Plaintiff's responses indicate that despite her

back injury, she is able to perform some of her usual household tasks, does not try to

get other people to do things for her, her back injury does not cause Plaintiff to walk or ascend stairs at a slower than usual pace, nor does Plaintiff stay in bed most of the time because of her back).  Dr. Horvath also inconsistently opines that he last treated Plaintiff on April 1, 2015, yet Plaintiff's cervical and lumbar spine condition generally worsened when Plaintiff did not receive chiropractic treatment.  Dr. Horvath's Report ¶ 9.  Although Dr. Horvath reports ROM measurements taken at a July 14, 2014 reevaluation were obtained using an inclinometer, *id.* ¶ 12, Dr. Horvath's Medical Records do not indicate use of an inclinometer on that date, nor is the manner by which ROM measurements were obtained indicated elsewhere within the relevant medical records for any treatment date.  Accordingly, as Defendant asserts, Dr. Horvath's Report regarding the severity of Plaintiff's injuries is inconsistent with Dr. Horvath's Medical Records and without timely disclosure, Defendant was denied the opportunity to depose Dr. Horvath regarding the inconsistencies.

That Defendant was without the putative experts' summary reports required by Rule 26(a)(2)(C) for Plaintiff's putative expert witnesses, and because the summary reports are not supported by the treatment records for the same medical sources, permitting Plaintiff to belatedly disclose expert reports, after Defendant's time to depose and after Defendant has filed for summary judgment, would result in prejudice to Defendant.  This first factor thus favors Defendant.

As to the second factor regarding the length of the delay and its potential impact on judicial proceedings, Plaintiff does not dispute that the putative expert witness disclosures on January 27, 2017, occurred seven months after the expert witness disclosure deadline, with the filing of the instant motion on March 17, 2017, occurring

more than nine months after said deadline. Plaintiff does not argue that the length of this delay is not significant. That Defendant had already moved for summary judgment before Plaintiff identified the putative expert witnesses as such and provided their reports in which, for the first time, the witnesses opine beyond care and treatment, supports Defendant's argument that permitting the belated expert disclosures will require Defendant to seek an opportunity to depose the three putative expert witnesses, leading to additional delay as Defendant then will need to amend the summary judgment motion. Defendant's Response at 10-11. Accordingly, the record establishes that the length of the delay and its impact on the litigation is significant such that the second factor weighs against a finding of excusable neglect.

With regard to the third factor, Plaintiff attributes the delay to anticipation that the case may settle, Plaintiff's Memorandum at 6-7, McGillicuddy Affidavit ¶¶ 24-30, and lack of familiarity with federal practice. McGillicuddy Affidavit ¶¶ 30-31. Plaintiff's asserted anticipation of settlement, which would moot the need for any disclosure, including expert disclosure, is flatly disputed by Defendant. Defendant's Response at 3-4 (maintaining the parties have not engaged in any settlement discussions since the initial mediation session in January 2015, and during an October 3, 2016 telephone conversation, Plaintiff was advised of Defendant's plan to file a dispositive motion such that Plaintiff was on notice Defendant "was not then interested in seriously exploring mediation while a dispositive motion was pending."). Regardless of the veracity of Plaintiff's assertion, it is settled that ongoing settlement negotiations do not obviate the need to follow the scheduling order. *See Arnold v. Krause, Inc.*, 232 F.R.D. 58, 65-66 (W.D.N.Y. 2004) (finding no good cause existed for modifying deadline for discovery

based on plaintiff's unwarranted belief that settlement was likely and obviated need to provide expert disclosure for which the plaintiff's request to extend was denied), *affirmed*, 233 F.R.D. 126 (W.D.N.Y. 2005). Significantly, each of the court's Scheduling Orders provided "[t]he continuation of mediation sessions shall not delay or defer other dates set forth in this Scheduling Order." *See* November 12, 2014 Scheduling Order (Dkt. 12), ¶ 11; First Amended Scheduling Order (Dkt. 26), ¶ 11; Second Amended Scheduling Order (Dkt. 29), ¶ 5; Third Amended Scheduling Order (Dkt. 34), ¶ 5; and Fourth Amended Scheduling Order (Dkt. 38), ¶ 3. As to Plaintiff's attributing the reason for the delay on lack of familiarity with federal practice, McGillicuddy Affidavit ¶¶ 30-31, "ignorance of the rules, or mistakes construing the rules do not usually constitute 'excusable' neglect. . . ." *Pioneer Inv. Servs. Co.*, 507 U.S. at 392. Nor does Plaintiff dispute that familiarity with federal practice was within Plaintiff's reasonable control. *Id.* Accordingly, the third factor, on which the most weight is placed, *Silivanch*, 333 F.3d at 366, weighs heavily in Defendant's favor.

With regard to the fourth factor for excusable neglect, *i.e.*, the movant's good faith, the e-mails exchanged between attorneys for Plaintiff and Defendant, and forwarded to the undersigned, reveal no dispute as to whether Defendant agreed in October 2016, four months after the latest expert disclosure cut-off, to accept Plaintiff's provision of expert reports after Defendant moved for summary judgment. *See*, *generally*, Plaintiff's Exh. J (Dkt. 47-11). Significantly, Plaintiff's assertion in the February 6, 2017 e-mail that Defendant had agreed in October 2016 to accept late expert disclosure "on the contingency that [Paintiff] forward all recent medical records. . . ." *id.* at 3, both ignores that the parties could not, after the expiration of the expert

discovery deadline in June 2016, stipulate to its extension, Fed.R.Civ.P. 6(b)(1)(B)

(requiring a court order to extend a deadline after its expiration), and treats as a

bargaining tool Plaintiff's provision of supplemental discovery which is required under

Fed.R.Civ.P. 26(e) (providing that any party who has made a disclosure under Rule

26(a), including both general and expert disclosures, is required to supplement or

correct any such disclosure in a timely manner or as ordered by the court). Accordingly,

the fourth factor for excusable neglect, *i.e.*, whether Plaintiff acted in good faith in

moving to extend the deadline for expert disclosures, also weighs against Plaintiff.

Because all four factors weigh against a finding of excusable neglect, Plaintiff's motion

is DENIED.

Accordingly, as a consequence of Plaintiff's failure to timely produce the

summary reports for Drs. Simmons, Tetro, and Horvath, such witnesses may not testify

as experts and their Fed.R.Civ.P. 26(a)(2)(C) summary reports, untimely submitted, are

stricken from the record. Drs. Simmons, Tetro, and Horvath are restricted to testifying

solely as fact witnesses, in which capacity they are "precluded from rendering opinion

based upon information obtained outside the course of treatment and beyond the

reasonable reading of the providers' medical records." *Franz*, 2011 WL 5443856, at * 2.

In other words, Drs. Simmons, Tetro, and Horvath may opine as to the cause of

Plaintiff's medical condition, her prognosis, and the extent of any disability caused by

the alleged injuries, so long as those opinions are based upon each respective doctor's

medical care and treatment of Plaintiff, but may not offer opinions not gleaned from

personal diagnosis and treatment of Plaintiff. *Id.*

## 2.    Summary Judgment

Summary judgment of a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) and (b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003).  The court is required to construe the evidence in the light most favorable to the non-moving party.  *Collazo v. Pagano*, 656 F.3d 131, 134 (2d Cir. 2011).  The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment.  *Celotex*, 477 U.S. at 322; *see Anderson*, 477 U.S. at 247-48 ("summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

"[T]he evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions."  *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988)).  A defendant is entitled to summary judgment where "'the plaintiff has failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on'" an essential element of a claim on which the plaintiff bears the burden of proof.  *In re Omnicom Group, Inc., Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010) (quoting *Burke v. Jacoby*, 981 F.2d 1372, 1379 (2d Cir. 1992)).  Once a party moving for summary judgment has made a properly

supported showing of the absence of any genuine issue as to all material facts, the

nonmoving party must, to defeat summary judgment, come forward with evidence that

would be sufficient to support a jury verdict in its favor. *Goenaga v. March of Dimes*

*Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995). "An issue of fact is genuine

and material if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Cross Commerce Media, Inc. v. Collective, Inc.*, 841 F.3d 155, 162

(2d Cir. 2016) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133,137 (2d Cir.

2009)). "Assessments of credibility and choices between conflicting versions of the

events are matters for the jury, not for the court on summary judgment." *Rule v. Brine,*

*Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996).

Plaintiff's claims are brought under the Federal Tort Claims Act ("FTCA"),

pursuant to which the federal government waives its sovereign immunity to suits for the

negligent acts of its employees in "circumstances where the United States, if a private

person, would be liable to the claimant in accordance with the law of the place where

the act or omission occurred." 28 U.S.C. § 1346(b)(1). As such, Plaintiff's claims are

subject to New York substantive law, *see Brutton v. United States*, 687 Fed.Appx. 56,

57 (2d Cir. Apr. 14, 2017) (summary order) ("New York law applies to the state tort

claims against [the private defendant] as well as to the FTCA claims against the United

States."), and no party argues otherwise.

In support of summary judgment, Defendant does not address the issue of

liability for the collision, arguing instead that Plaintiff is barred from recovering (1)

pecuniary damages because Plaintiff did not incur more than $ 50,000 in basic

economic losses, Defendant's Memorandum at 5-6; (2) non-economic losses because

she did not sustain a "serious injury" as defined under N.Y. Ins. Law § 5102(d) ("§ 5102(d)"), *id*. at 7-10; and (3) non-economic losses for injuries not causally-related to the collision. *Id*. at 10-12. Defendant further maintains Plaintiff's injuries do not meet § 5102(d)'s criteria for serious injury under the three categories identified by Plaintiff. *Id*. at 13-22. In opposing summary judgment, Plaintiff argues the evidence in the record, including the reports of Drs. Simmons, Tetro, and Horvath, establishes Plaintiff sustained serious injuries under § 5102(d), Plaintiff's Memorandum at 7-14, under the significant limitation of use category, which can be substantiated through both quantitative and qualitative assessments, *id*. at 14-19, the permanent consequential limitation of use category, *id*. at 20-21, and the so-called "90/180" category. *Id*. at 21-25. In further support of summary judgment, Defendant asserts that absent Plaintiff's proposed expert disclosures, which the court has stricken, the evidence before the court establishes Defendant is entitled to summary judgment as a matter of law, Defendant's Reply at 1-2, Plaintiff's opposition to summary judgment fails to respond to each paragraph of Defendant's Statement of Facts, requiring such statements be deemed admitted, *id*. at 2-3, the medical records produced during discovery fail to adequately described the manner by which Plaintiff's alleged ROM deficits were determined, *id*. at 3, or to establish recent examination as required to support a claim of permanency, *id*. at 4-5, and insofar as Plaintiff relies on unsworn medical treatment records, such records submitted in opposing summary judgment constitute inadmissible evidence that may not be considered. *Id*. at 4-5.

## A.      Local Rule 56(a)

Preliminarily, the court addresses Plaintiff's failure to fully comply with Local Rule of Civil Procedure 56(a) ("Local Rule 56(a)"), requiring a party opposing summary judgment to separately respond to each paragraph of Defendant's Statement of Facts offered in support of summary judgment.  According to Defendant, Plaintiff's failure to do so requires deeming admitted those facts to which Plaintiff has not sufficiently responded.  Defendant's Reply at 2-3.  Plaintiff does not dispute this assertion. Pursuant to Local Rule 46(a)(1), a summary judgment motion filed under Fed.R.Civ.P. 56 must be accompanied by

> a separate, short, and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried.  Each such statement must be followed by citation to admissible evidence as required by Fed.R.Civ.P. 56(c)(1)(A).  Citations shall identify with specificity the relevant page and paragraph or line number of the evidence cited. Failure to submit such a statement may constituted grounds for denial of the motion.

Local R. Civ. P. – W.D.N.Y. 56(a)(1).

Additionally,

> The papers opposing a motion for summary judgment shall include a response to each numbered paragraph in the moving party's statement, in correspondingly numbered paragraphs and, if necessary, additional paragraphs containing a short and concise statement of additional material facts as to which it is contended there exists a genuine issue to be tried.  Each numbered paragraph in the moving party's statement of material facts may be deemed admitted for purposed of the motion unless it is specifically controverted by a correspondingly numbered paragraph in the opposing statement.

Local R. Civ. P. – W.D.N.Y. Rule 56(a)(2).

Although the court does not condone Plaintiff's noncompliance with Rule 56(a), "[a] local rule imposing a requirement of form must not be enforced in a way that causes a party to lose any right because of a nonwillful failure to comply."  Fed.R.Civ.P. 83(a)(2); *Buck*

*v. Cleary*, 345 Fed.Appx. 660, 662 (2d Cir. Sept. 14, 2009) (finding district court abused

discretion in deeming admitted defendants' statement of material facts based on

plaintiff's failure to separately respond to each stated fact as required under applicable

local rule, vacating lower court's decision to do so in the absence of any evidence that

the failure to comply was willful, and remanding that portion of the judgment based on

such deemed admitted facts).  Similarly, nothing in the instant record establishes, or

even suggests, Plaintiff's failure to formally comply with Local Rule 56(a)(1) and (2) was

willful.  Accordingly, despite Plaintiff's undisputed failure to comply with Local Rule

56(a)(1) and (2), the court, in the exercise of its discretion, should not deem admitted

Defendant's statement of undisputed facts based on Plaintiff's non-compliance.

> **B.     New York No-Fault Insurance Law**

Under New York's Comprehensive Automobile Insurance Reparations Act,

commonly known as the "No-Fault Insurance Law," automobile owners in New York are

required to carry automobile insurance compensating injured parties for "basic

economic loss" caused by the use or operation of the automobile within New York,

regardless of fault.  *Pommells v. Perez*, 830 N.E.2d 278, 280 (N.Y. 2005) (citing N.Y.

Ins. Law §§ 5102[a], 5103).  Under the No-Fault Law, a plaintiff may not recover for

basic economic losses such as unreimbursed medical expenses, lost wages, or

property damage unless such losses exceed $ 50,000.  N.Y. Ins. Law § 5102(a).

Further, "[o]nly in the event of 'serious injury' as defined in the statute, can a person

initiate suit against the car owner or driver for damages caused by the accident."

*Pommells*, 830 N.E.2d at 280 (quoting N.Y. Ins. Law § 5104[a]).  As such, "No-Fault

thus provides a compromise: prompt payment for basic economic loss to injured

persons regardless of fault, in exchange for a limitation on litigation to cases involving serious injury." *Id.* (underlining added; citing *Montgomery v. Daniels*, 340 N.E.2d 444 (N.Y. 1975)).

"By enacting the No-Fault Law, the Legislature modified the common-law rights of persons injured in automobile accidents to the extent that plaintiffs in automobile accident cases no longer have an unfettered right to sue for injuries sustained." *Licari v. Elliott*, 441 N.E.2d 1088, 1091 (N.Y. 1982) (citing *Montgomery v. Daniels*, 340 N.E.2d 444, 453-54 (N.Y. 1975). In particular,

> Notwithstanding any other law, in any action by or on behalf of a covered person against another covered person for personal injuries arising out of negligence in the use or operation of a motor vehicle in this state, there shall be no right of recovery for non-economic loss, except in the case of a serious injury, or for basic economic loss.

N.Y. Ins. Law § 5104(a) ("§ 5104(a)").

"Thus, to the extent that the Legislature has abrogated a cause of action, the issue is one for the court, in the first instance where it is properly raised, to determine whether the plaintiff has established a prima facie case of sustaining serious injury." *Licari*, 441 N.E.2d at 1091. As such, it "is incumbent upon the court to decide in the first instance whether plaintiff has a cause of action to assert within the meaning of the statute," *id.*, and "[i]f it can be said, as a matter of law, that plaintiff suffered no serious injury within the meaning of [§ 5102(d)], then plaintiff has no claim to assert and there is nothing for the jury to decide." *Id.* at 1092.

### 1. Pecuniary Damages and Economic Losses

Defendant argues Plaintiff cannot recover pecuniary damages because Plaintiff did not incur more than $ 50,000 in basic economic losses. Defendant's Memorandum

at 5-6.  Plaintiff has not argued in opposition to this assertion, nor has Defendant argued in further support of it.

To recover under New York's No-Fault Law, Plaintiff must establish she incurred more than $ 50,000 in damages from medical expenses, lost wages, and other reasonable and necessary expenses attributed to her claimed injuries.  N.Y. Ins. Law § 5102(a); *Ventra v. United States*, 121 F.Supp.2d 326, 332 (S.D.N.Y. 2000).  In the instant case, Defendant's interrogatory No. 9 inquired as to the amount of medical expenses incurred, as well as the amount of future medical expenses anticipated as a result of Plaintiff's alleged injuries.  Defendant's Interrogatory No. 9 (Dkt. 43-1 at 18). Plaintiff responded, "[u]pon information and belief, the plaintiff has suffered $91,966.00 in damages for bodily injuries, pain and suffering, and loss of enjoyment of life as a result of the subject incident.  Additionally, she incurred less than $1,000 in out-of-pocket expenses up to this point." *Id.*  In response to Defendant's Interrogatory No. 11, inquiring about other medical expenses, Plaintiff responded she was then "unaware of the exact amounts incurred for special damages, ie, physicians services, medicines, medical attendances, hospital expenses, nursing services, x-rays, and all other such expenses." *Id.* at 19-20.  Nevertheless, Plaintiff was attempting to obtain a complete accounting of all medical expenses and was to furnish a supplemental response when the information was obtained.  *Id.*  Defendant maintains, Defendant's Memorandum at 6 n. 3, and Plaintiff does not dispute, that no relevant supplemental responses were ever provided.  Although at her January 7, 2016 deposition, Plaintiff testified that "I'm sure I do have bills at home and there's some things that I did submit to no-fault that I'm sure I

have copies of those," Plaintiff's Dep. Tr. [9] at 99-100, Defendant maintains, Defendant's Memorandum at 6 n. 3, and Plaintiff does not dispute, that no such information was ever provided. Plaintiff thus has failed to provide any documentary support for any of her asserted medical expenses which, as a result, are purely speculative and thus are insufficient to establish an issue of fact so as to avoid summary judgment. *See Wilson v. Colosimo*, 959 N.Y.S.2d 301, 304 (4th Dep't 2012) (granting defendants summary judgment where the plaintiff failed to provide any evidence of economic loss as required to support economic loss claim under No-Fault Law).

Plaintiff encounters the same problem insofar as Plaintiff provided no documentation for her alleged lost income from her substitute teaching position with the Buffalo Public School District. As Defendant further maintains, Defendant's Memorandum at 6-7, although Plaintiff alleges she was unable to return to work as a substitute school teacher for the balance of the 2012-2013 school year, resulting in missing the 37 school days between May 7, 2013 and June 26, 2013, for which Plaintiff would have been paid $ 110 per day, Plaintiff provided no documentation that she substitute taught every day until the accident, and that he injuries caused her to turn down substitute teaching opportunities following the accident, including until the end of the regular school year on June 26, 2013, and summer school for the summer of 2013. Indeed, the record establishes that Dr. Liu-Chen, Plaintiff's primary care physician, authorized Plaintiff to return to substitute teaching as of May 13, 2013, *see* New York Motor Vehicle No-Fault Insurance Law, Verification of Treatment by Attending Physician (Dkt. 43-9 at 13-14) (Dr. Liu-Chen indicating on May 17, 2013, that Plaintiff was

---

[9] References to "Plaintiff's Dep. Tr." are to pages of the transcript of Plaintiff's deposition, portions of which are filed as Defendant's Exh. E (Dkt. 43-2), and as Plaintiff's Exh. F (Dkt. 47-7).

disabled from work for the period May 7 through May 10, 2013 based on low back pain

and acute next pain attributed to the May 7, 2013 collision). This is consistent with Dr.

Leddy's Report that Plaintiff stated "she missed one to 2 weeks of school after the

accident but then returned," Dr. Leddy's Report at 1, as well as Dr. Horvath's indication

in his report of September 27, 2013 (Dkt. 43-4 at 2-4), that Plaintiff was then "working,"

and Dr. Marconi's report (Dkt. 43-9 at 8-12), that Plaintiff "did return[ ] to work in

September 2013 at Bennett High School as an English teacher." Significantly, Plaintiff

has not challenged the accuracy of any of these medical reports.

Accordingly, Plaintiff's claim for lost wages is unsupported by any documentation

and, thus, is purely speculative and insufficient to avoid summary judgment insofar as

Plaintiff seeks to recover for basic economic loss stemming from the collision. *Wilson*,

959 U.S. at 304.

### 2.    "Serious Injury"

Regardless of whether Plaintiff sustained in excess of the $ 50,000 threshold in

damages from medical expenses, lost wages, and other reasonable and necessary

expenses to sustain a claim for basic economic expenses, to recover for non-economic

losses, Plaintiff must establish she sustained a "serious injury" under New York's No-

Fault Law. N.Y. Ins. Law § 5104(a) ("there shall be no right of recover for non-economic

loss, except in the case of a serious injury . . ."). As relevant, a "serious injury" is

defined as

> A personal injury which results in death; dismemberment; significant
> disfigurement; a fracture; loss of a fetus; permanent loss of use of a body organ,
> member, function or system; permanent consequential limitation of use of a body
> organ or member; significant limitation of use of a body function or system; or a
> medically determinable injury or impairment of a non-permanent nature which
> prevents the injured person from performing substantially all of the material acts

which constitute such person's usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment.

N.Y. Ins. Law § 5102(d).

"There can be little doubt that the purpose of enacting an objective verbal definition of serious injury was to 'significantly reduce the number of automobile personal injury accident cases litigated in the courts, and thereby help contain the no-fault premium.'" *Licari*, 441 N.E.2d at 1091 (quoting Memorandum of State Executive Dep't, 1977 McKinney's Session Laws of N.Y., p. 2448). "While it is clear that the Legislature intended to allow plaintiffs to recover for noneconomic injuries in appropriate cases, it had also intended that the court first determine whether or not a prima facie case of serious injury has been established which would permit a plaintiff to maintain a common-law cause of action in tort." *Id.* (citing cases).

Accordingly, in the instant case, to establish a "serious injury," Plaintiff must submit medical evidence demonstrating at least one of the nine categories of serious injury specified under § 5102(d). Here, Plaintiff generally seeks to recover for injuries to her left wrist, cervical, and lumbar spines allegedly sustained during the collision.[10] Plaintiff specifies that her injuries meet three of § 5102(d)'s nine categories of serious

---

[10] Plaintiff specifically claims she sustained as a result of the collision the following injuries: "contusion, whiplash, neck pain, left wrist pain, left wrist sprain, left hand diffuse tenosynovitis, left wrist extensor tenosynovitis, left wrist trapeziometacarpal CMC joint capsular laxity, left shoulder pain, leg numbness, leg tingling, headaches, low back pain with radiculopathy, cervical spine retrolisthesis with loss of disc osteophyte complex and central disc herniation, unconvertebral hypertrophy and moderate left foraminal narrowing, left lumbar far lateral disc herniation resulting in moderate left foraminal narrowing with a left facet cyst, spondylosis, retrolisthesis, and mild central stenosis at C6-7, cervical radiculitis, broad disc herniation at L4-5 with left and right lateral radial annular tears, facet hypertrophy with left L4 nerve root impression, right L4 nerve root abutment, moderate left and mild right foraminal narrowing, mild lateral recess stenosis, L5 root abutment, borderline central spinal stenosis, stable hydration loss from T11-12 to L4-5, thoracic sprain/strain, cephalgia, and myofascial pain syndrome." Plaintiff's Answers to Defendant's First Set of Interrogatories, Defendant's Exh. D (Dkt. 43-1 at 12-22), Interrogatory 6.

injury, including (1) a significant limitation of use of a body function or system; (2) permanent consequential limitation of use of a body organ or member; and (3) medically determined injury or impairment of a non-permanent nature which prevented Plaintiff from performing substantially all of the material acts constituting her usual and customary daily activities for at least 90 of the 180 days immediately following the collision (the "90/180" category).

To obtain summary judgment on Plaintiff's serious injury claim under § 5102(d), Defendant's initial burden is to establish by competent medical evidence that Plaintiff did not sustain a "serious injury" within the meaning of § 5102(d). *See Yong Qin Luo v. Mikel*, 625 F.3d 772, 776-77 (2d Cir. 2010) (recognizing threshold issue on defendant's summary judgment motion on § 5102(d) serious injury claim is whether the plaintiff sustained a serious injury within the meaning of § 5102(d) (citing *Licari*, 441 N.E.2d at 1091)). In contrast, to avoid summary judgment, Plaintiff must establish, by competent medical evidence, a genuine issue of material fact exists as to whether she sustained such an injury. *See McHugh v. Marfoglia*, 885 N.Y.S.2d 550, 551 (4th Dep't 2009) (reversing lower court's denial of plaintiff's partial summary judgment motion on threshold issue of serious injury where plaintiff's objective medical evidence showed plaintiff suffered spine injury requiring surgery and resulting in permanent loss of ROM (citing *Toure v. Avis Rent A Car Sys.*, 774 N.E.2d 1197, 1201-02 (2002))). In attempting to establish the plaintiff's injuries are not serious within the meaning of § 5102(d), a defendant can rely on "the affidavits or affirmations of medical experts who have examined the plaintiff and concluded that no objective medical findings support the plaintiff's claim." *Grossman v. Wright*, 707 N.Y.S.2d 233, 237 (2d Dep't 2000).

Although generally, a physician's opinion is admissible as evidence only "when subscribed and affirmed by him to be true under penalties of perjury," N.Y. Civ. Prac. L. & R. 2106(a), the defendant may rely on unsworn medical records provided by the plaintiff to the defendant, although in doing so, the defendant opens the door for the plaintiff to also rely upon the same, unsworn records in opposing summary judgment. *Kearse v. New York City Transit Authority*, 789 N.Y.S.2d 281, 283-84 & n. 1 (2d Dep't 2005) (citing cases). *See also Yong Qin Luo*, 625 F.3d at 777 (in establishing its *prima facie* case, a defendant may rely upon the plaintiff's unsworn treatment records, but to rebut the defendant's showing, the plaintiff must provide affidavits, affirmations or other sworn statements). Upon establishing such a *prima facie* case, the burden shifts to the opposing party to point to evidence showing a genuine issue of material fact on this issue. *Licari*, 441 N.E.2d at 1091. Furthermore, the '[p]laintiff must present objective proof of injury, as subjective complaints of pain will not, standing alone, support a claim for serious injury." *Yong Qin Luo*, 625 F.3d at 777.

> **a.** **Permanent Consequential Limitation of Use of a Body Organ or Member/Significant Limitation of Use of a Body Function or System**

Plaintiff alleges numerous physical problems with her left wrist, and cervical and lumbar spines resulting in permanency or "significant limitation of use of a body organ, member, function or system" as required under § 5102(d). A review of Plaintiff's medical records, however, establishes they fall short of demonstrating a material issue of fact as to whether Plaintiff sustained a "serious injury" under either of these categories.

Because both a "consequential limitation" and a "significant limitation" are similarly construed as more than a "'minor, mild or slight limitation of use,'" *Gaddy v. Eyler*, 591 N.E.2d 1176, 1177 (N.Y. 1992) (quoting *Licari*, 441 N.E.2d at 1091, and citing *Scheer v. Koubek*, 512 N.E.2d 309, 309 (N.Y. 1987)), the court addresses both categories together.  As used in § 5102(d), "significant" is "construed to mean something more than a minor limitation of use."  *Licari*, 441 N.E.2d at 1091. Specifically, "a minor, mild or slight limitation of use should be classified as insignificant within the meaning of [§ 5102(d)]."  *Id.*  Accordingly, for Plaintiff to establish a serious injury under these categories and avoid summary judgment, Plaintiff must establish both that her injuries resulted in limited use of a body organ, member, function or system, as well as that such limitation is significant.  *Licari*, 441 N.E.2d at 1092-93.

Where, as here, a plaintiff seeks recovery of damages for a serious injury based on a soft tissue injury associated with complaints of pain and loss of ROM, courts are to evaluate such claims with "well-deserved skepticism."  *Pommells*, 830 N.E.2d at 281. Although the medical evidence establishes Plaintiff has several bulging discs in her cervical and lumbar spines indicative of degenerative disc disease, a diagnosis of general disc pathology, including a bulging or herniated disc, alone is insufficient to establish a serious injury under § 5102(d).  *See Pommells*, 830 N.E.2d at 282 ("Proof of a herniated disc, without additional objective medical evidence establishing that the accident resulted in significant physical limitations, is not alone sufficient to establish a serious injury.").  *See also Toure*, 774 N.E.2d at 1201 n. 4 (recognizing New York's "Appellate Divisions have held that a diagnosis of a bulging or herniated disc, by itself, does not constitute a serious injury." (citing cases)).  Rather, such claims "must be

supported by medical records and may not be based solely on plaintiff's testimony and subjective complaints of pain." *Jones v. United States*, 408 F.Supp.2d 107, 117 (E.D.N.Y. 2006). Admissible objective evidence for this purpose includes X-rays, MRIs and CT scans, use of a goniometer or inclinometer to measure ROM, straight leg raising test to detect pain, and other objective medical testing. *See Smith v. Reeves*, 946 N.Y.S.2d 750, 752 (4th Dep't 2012) (in the absence of any objective medical test results, treating physician's affirmation regarding the plaintiff's symptoms insufficient to create issue of fact to avoid summary judgment); *O'Gorman v. Prus*, 10 N.Y.S.3d 830, 833 (Westchester Cty. 2015) (requiring objective proof of alleged extent of physical limitation resulting from disc injuries to raise triable issue of fact and avoid summary judgment). "'MRIs, X-rays and CT scans are objective and credible medical evidence of a serious injury because they do not rely on the patient's complaints of pain.'" *Davis v. United States*, 2012 WL 88307, at * 5 (N.D.N.Y. Jan. 11, 2012) (quoting *Mastrantuono v. United States*, 163 F.Supp.2d 244, 254 (S.D.N.Y. 2001)). The "extent or degree of physical limitation" posed by an injury also may be proven by "an expert's designation of a numeric percentage of a plaintiff's loss of range of motion [which] can be used to substantiate a claim of serious injury." *Toure*, 774 N.E.2d 1197, 1200 (N.Y. 2002) (bracketed text added). Although "there is no set percentage for determining whether a limitation in range of motion is sufficient to establish 'serious injury,' the cases have generally found that a limitation of twenty percent or more is significant for summary judgment purposes." *Hodder v. United States*, 328 F.Supp.2d 335, 356 (E.D.N.Y. 2004) (collecting cases). "[L]ess than 20% limitation has been found insufficient to survive a motion for summary judgment." *Id.* Where, however, a decreased ROM is asserted as

proof of a serious injury, the medical findings must indicate the methodology used to calculate the reduced ROM, as well as whether such methodology consisted of active or passive ROM tests. *Watson-Tobah v. Royal Moving & Storage, Inc.*, 2014 WL 6865713, at *18 (S.D.N.Y. Dec. 5, 2014) (holding medical reports of restricted ranges of motion were "insufficient to overcome defendants' prima facie showing of the absence of a serious injury" so as to meet plaintiff's burden in opposing summary judgment because "there is no indication as to the methodology used to calculate the degrees of restriction and whether the tests conducted were passive or active range-of-motion tests.").

The difference between "active" and "passive" ROM tests has been explained by one court as follows:

> [T]here are two types of range of motion tests: passive and active. In performing active range of motion tests, the patient is asked to move the body part at issue in various directions and is asked to indicate when further movement become restricted or painful. In the passive range of motion test, the examiner moves the injured body part until the motion is restricted or pain is created. The doctor measures the range of the patient's ability to move the subject body part, sometimes with a protractor, and then compares that to the patient's 'normal' range of motion if the patient has a prior history with the doctor, or with what is considered normal of people of the same age and sex of the patient.
>
> The results of the passive test are based upon more objective criteria, because the doctor controls the movements. However, the fact is that most doctors will stop moving the patient once the patient begins to complain of pain, whether truthful or not. Thus, courts have required that the physician conduct objective range of motion tests, and quantify the results of the range of motion tests.

*Hodder*, 328 F.Supp.2d at 355 (citations and quotation marks omitted).

Courts have not hesitated to dismiss claims on summary judgment where the plaintiff's medical evidence fails to specify the objective medical tests performed or to explain whether the ROM tests conducted were active or passive. *See*, *e.g.*, *Hodder*, 328

F.Supp.2d at 356-57 (holding plaintiff failed to establish a serious injury under § 5102(d) based on decreased ROM of spine where treating chiropractor failed to clarify whether tests he conducted to elicit decreased ROM results were active or passive); *Palasek v. Misita*, 734 N.Y.S.2d 587, 588 (2d Dep't 2001) (affirming summary judgment for the defendant where, *inter alia*, plaintiff's treating physician's affidavit "failed to set forth the objective medical tests performed by the examining physician to determine that the plaintiff suffered specifically-quantified restrictions of motion in her neck and back."); and *Gillick v. Knightes*, 719 N.Y.S.2d 335, 336 (2d Dep't 2001) ("We have repeatedly held that a diagnosis of loss of range of motion, because it is dependent on the patient's subjective expression of pain, is insufficient to support an objective finding of serious injury.").

In the instant case, Plaintiff has submitted medical records showing that following the collision, she experienced decreased ROM in her cervical and lumbar spines, and left wrist. Plaintiff's medical records, however, fail to establish the methodology by which the decreased ROMs were ascertained such that Plaintiff cannot establish she sustained under § 5102(d) a serious injury based on a permanent or significant loss of use of a body part, member, function or system.

In particular, on August 6, 2013, Dr. Simmons determined Plaintiff's ROM limited to 30% for flexion, extension, and right and left rotation of her cervical spine, and limited to 30% for flexion, and 20% for extension of her lumbar spine. Plaintiff's Exh. O (Dkt. 47-16) at 23. Dr. Horvath similarly determined Plaintiff had ROM deficits with regard to flexion, extension, right and left rotation, and right and left lateral in both her cervical and lumbar spines. *See*, *e.g.*, Plaintiff's Exh. P (Dkt. 47-17) at 15. At his initial

evaluation of Plaintiff on July 24, 2013, Dr. Tetro reported Plaintiff's left wrist showed ROM deficits with dorsiflexion and palmarflexion. Plaintiff's Exh. Q (Dkt. 48), at 28-29; Defendant's Exh. G (Dkt. 43-4) at 12. Despite this evidence showing decreased ROM for Plaintiff's cervical and lumbar spines, the reports fail to specify whether the measurements are based on active or passive ROM assessments, nor is the methodology used to obtain the ROM measurements identified.[11] As discussed above, the medical evidence's failure to set forth the methodology used to determine Plaintiff's asserted cervical and lumbar spine ROM deficits is fatal to this aspect of her serious injury claim.

With further regard to Plaintiff's left wrist injury, the evidence establishes that following receipt of a corticosteroid injection on September 27, 2013, such injury essentially has resolved and is asymptomatic, with Plaintiff maintaining she experiences only occasional stiffness and slight pain during inclement weather. *See*, *e.g.*, Plaintiff's Exh. Q (Dkt. 48) at 19 (repeated at 23, and Defendant's Exh. G (Dkt. 43-4) at 2) (Dr. Tetro reporting on September 27, 2013 that Plaintiff "has noted near complete relief of her left wrist pain following a corticosteroid injection."); Plaintiff's Dep. Tr. at 97-98 ("My wrist feels okay. I don't - - sometimes the weather changes and it becomes a little painful and some stiffness but it's all right."). Nor is there any information in the record

---

[11] Nor do any other records of Dr. Simmons, Dr. Tetro, or Dr. Horvath submitted in connection with Plaintiff's stricken, putative expert witness reports of measurements of Plaintiff's ROM, active or passive, relative to her alleged injuries, indicate the methodology used to obtain such ROM measurements. Although Dr. Horvath does state in his stricken summary report that "[a]ll range-of-motion deficits were objectively measured using an inclinometer, which is a device used to measure an angle of inclination[, such that t]he measurements did not depend solely on Ms. Catania's subjective complaints of pain," Dr. Horvath's Report (Dkt. 47-17), ¶ 3, the impact of such fact on the court's consideration of the medical records, *i.e.*, elevating the ROM measurements to objective evidence that could defeat summary judgment, further demonstrates why timely disclosure of the non-retained medical sources' summary reports is required.

establishing Plaintiff continues to have any decreased ROM of her left wrist.  As such,

Plaintiff is unable to establish either a permanent, consequential, or a significant

limitation based on her left wrist injury.

### b.    The "90/180 Category"

Nor is there any merit to Plaintiff's contention that her injuries may be considered

serious under § 5102(d)'s so-called "90/180 category," *Toure*, 774 N.E.2d at 1204,

pursuant to which a plaintiff may recover damages if, as a result of an accident, the

plaintiff suffered a non-permanent, medically determined injury or impairment that

prevented the plaintiff "from performing "substantially all of the material acts which

constitute [the plaintiff's] usual and customary daily activities for not less than" 90 of the

180-day period "immediately following" the injury.  N.Y. Ins. Law § 5102(d).

Qualification as a serious injury under the "90/180 category" requires the non-

permanent injury to have resulted from the accident, N.Y. Ins. Law § 5104(a), and be

shown to have prevented a plaintiff "'from performing his usual activities to a great

extent rather than some slight curtailment.'"  *Escoto v. United States*, 848 F.Supp.2d

315, 330 (E.D.N.Y. 2012) (quoting *Thompson v. Abbasi*, 788 N.Y.S.2d 48, 49 (1st Dep't

2005)).  Despite lacking "the 'significant' and 'consequential' terminology" of the two

previously discussed categories, Discussion, *supra*, at 39-40, to establish a serious

injury under the 90/180 category, "a plaintiff must present objective evidence of 'a

medically determined injury or impairment of a non-permanent nature.'"  *Toure*, 774

N.E.2d at 1024 (quoting N.Y. Ins. Law § 5102[d]; and *Licari*, 441 N.E.2d at 1091-92).

In the instant case, the period of time with which the court is concerned with

regard to Plaintiff establishing serious injury under the 90/180 category ends 180 days

following the May 7, 2013 collision, *i.e.*, November 3, 2013.  Significantly, the record is devoid of any medical affidavit or statement from any medical provider who treated Plaintiff during the relevant 180-day period attesting to Plaintiff's inability to engage in her customary daily activities for at least 90 of those 180 days.  *See Sainte-Aime v. Ho*, 712 N.Y.S.2d 133, 136 (2d Dep't 2000) (statements reported in physician's affidavit that were based on the plaintiff's own self-serving statements and unsupported by any objective medical evidence were insufficient to establish serious injury under N.Y. Ins. Law § 5102(d)'s 90/180 rule).

Specifically, although Plaintiff maintains that the injuries she sustained as a result of the collision prevented her from returning to work for the rest of the 2012-2013 school year, Plaintiff's Response to Defendant's Interrogatory No. 15 (Defendant's Exh. D at 9; Dkt. 43-1 at 21), and caused Plaintiff to turn down employment as a substitute teacher for the summer of 2013, *id.*, Plaintiff has submitted no evidence that she was ever offered a substitute teacher position for the summer of 2013 that she was unable to accept because of the alleged injuries.  Moreover, on September 27, 2013, shortly after the new school year commenced, Dr. Tetro commented that Plaintiff had no disability and had returned to work.  Plaintiff's Exh. Q (Dkt. 48) at 21 (repeated at 25; Defendant's Exh. G (Dkt. 43-4) at 4).  Accordingly, given the late point in the 2012-2013 school year at which the collision occurred, and the close proximity to the start of the new school year when Plaintiff admitted she had returned to work, and Plaintiff's failure to produce any evidence that she was offered any employment as a substitute teacher for the summer of 2013, Plaintiff cannot establish her injuries prevented her from working for 90 of the 180 days following the collision because school was not in session for fewer

than 90 days between the May 7, 2013 collision and September 27, 2013 when Dr. Tetro reported Plaintiff had returned to work.

Nor is there any medical evidence in the record establishing any treating physician or chiropractor placed any limitations on Plaintiff's daily activities, a fact that has not escaped Dr. Leddy's notice. Dr. Leddy's Addendum at 5. *See Buccilli v. United States*, 2016 WL 4940260, at * 10 (W.D.N.Y. Feb. 3, 2016) (a personal injury plaintiff's deposition testimony regarding limitations attributed to a serious injury under the 90/180 day category "must be substantiated by objective medical proof. Self-serving statements of pain or limitation are insufficient to raise a triable issue of fact." (citing cases)). *See also Jones v. Marshall*, 47 N.Y.S.3d 791, 793-94 (3d Dep't 2017) ("objective evidence, such as medically imposed limitations upon daily activities, must support a plaintiff's claim under the 90/180-day category; self-serving assertions in this regard will not suffice." (citing *Clausi v. Hall*, 6 N.Y.S.3d 771, 774 (3d Dep't 2015); and *Shea v. Ives*, 26 N.Y.S.3d 816, 819 (3d Dep't 2016))). Simply, the medical records pertaining to Plaintiff for the relevant 180-day period, *i.e.*, May 7, 2013 through November 3, 2013, contain no physician's opinion or remark as to whether Plaintiff was able to perform her usual and customary activities warranting summary judgment. *See Turchuk v. Town of Wallkill*, 681 N.Y.S.2d 72, 73 (2d Dep't 1998) (holding personal injury plaintiff's self-serving statements that she was unable to perform household chores for six months following automobile accident, without more, were insufficient to establish the plaintiff sustained a medically-determined injury that prevented the plaintiff from performing substantially all of her usual and customary daily activities under the 90/180 category). In contrast, Dr. Luzi opined on July 17, 2013, that Plaintiff could

return to work with only some minor restrictions, including avoiding repetitive bending of the waist and neck, lifting or carrying more than 20 pounds, and sitting, standing or walking for prolonged periods of time, restrictions which Dr. Luzi did not find would preclude Plaintiff from working as a substitute teacher.  Dr. Luzi's Report, Dkt. 43-9 at 7.

Accordingly, summary judgment should be GRANTED as to Defendant on this aspect of Plaintiff's claims.

### 3.    Causally Related

Although the undersigned is recommending granting summary judgment to Defendant based on the failure of Plaintiff's medical records to establish any of Plaintiff's alleged injuries meets the criteria to be considered "serious" under § 5102(d), in the interest of completeness, the court alternatively considers Defendant's argument, Defendant's Memorandum at 10-12, that Plaintiff may not recover for non-economic losses for injuries not causally-related to the collision.  A review of the evidence in the record shows genuine issues of fact exist only as to whether Plaintiff's alleged lumbar spine and left wrist injuries are causally related to the collision so as to survive summary judgment.

In addition to establishing an injury meeting the criteria of a serious injury as defined by § 5102(d), Plaintiff must also establish the injury was caused by the collision. Significantly, "even where there is objective medical proof, when additional contributory factors interrupt the chain of causation between the accident and claimed injury – such as a gap in treatment, an intervening medical problem, or a preexisting condition – summary dismissal of the complaint may be appropriate."  *Pommells*, 830 N.E.2d at 281.  As discussed above, Facts, *supra*, at 5-7, Plaintiff has a preexisting history of

complaints of neck pain for which no medical resolution appears in the record, such that the court must compare Plaintiff's post-collision condition not only to normal ROMs for the affected joints, but also to her pre-collision ROMs. *See*, *e.g.*, *Jones v. United States*, 408 F.Supp.2d 107, 119-20 (E.D.N.Y. 2006) ("While plaintiff has significant limitations in his neck and back functions, they are not the result of the January 2000 car accident; rather, they emanate from pre-existing cervical vertebrae degenerations and a disc herniation."). Toward this end, Plaintiff's proof entirely fails with regard to her cervical spine injury because "[w]here, as here, a defendant's proof that the plaintiff has not sustained a serious injury as a result of the motor vehicle accident at issue rests in part on evidence that she had a preexisting condition prior to the accident, the plaintiff must address that contention in her medical reports" or face summary judgment. *Brusso v. Imbeault*, 699 F.Supp.2d 567, 585-86 (W.D.N.Y. 2010) (citing cases). Fatal to Plaintiff's serious injury claims based on her cervical spine is the absence of any evidence in the record establishing Plaintiff's cervical spine ROM prior to the collision, such that the requisite comparison with Plaintiff's cervical spine ROM after the collision cannot be made. Furthermore, even though the observation of degenerative changes prior to an accident does not necessarily preclude a determination that such degenerative changes left the plaintiff more injury-prone following a subsequent traumatic event which could aggravate preexisting injuries, *see Brown v. Miller*, 50 N.Y.S.3d 693, 693 (4th Dep't 2017) (recognizing personal injury plaintiff with preexisting degenerative changes in lumbar spine could recover for causally related serious injury only if the plaintiff could establish collision aggravated or exacerbated preexisting degenerative condition), more than a conclusory statement from a treating physician is

required to establish a causal connection.  *See Pommells*, 830 N.E.2d at 286-87 (where defendant presents evidence of preexisting degenerative disc condition causing the plaintiff's alleged injuries, the plaintiff, to survive summary judgment, must provide sufficient evidence, *i.e.*, more than a mere conclusory opinion, to refute the defendant's evidence and raise an issue of fact for the jury).  Here, even accepting the stricken opinions of Drs. Simmons and Horvath, neither opinion attempts to make the requisite cervical spine ROM comparison prior to and after the collision.  Nevertheless, with no preexisting injury established with regard to Plaintiff's lumbar spine and left wrist, no such ROM comparison is required for these alleged injuries, such that issues of fact remain as to the causation of Plaintiff's alleged lumbar spine and left wrist injuries.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion (Dkt. 47), is DENIED; Defendant's Motion (Dkt. 40) should be GRANTED; the Clerk of the Court should be directed to close the file.

SO ORDERED, as to Plaintiff's Motion.

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

Respectfully submitted, as to Defendant's Motion,

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      December 11, 2017
            Buffalo, New York

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited*, 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the Plaintiff and to the attorneys for the Defendant.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:     December 11, 2017
           Buffalo, New York